**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DIGITAL ALLY, INC.,                                    )
                                                       )
                    Plaintiff and Counterdefendant,    )
                                                       )
v.                                                     )        Case No. 09-2292-KGS
                                                       )
Z3 TECHNOLOGY, LLC,                                    )
                                                       )
                    Defendant, Counterplaintiff, and   )
                    Third Party Plaintiff,             )
                                                       )
v.                                                     )
                                                       )
ROBERT HALER,                                          )
                                                       )
                    Third Party Defendant.             )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Plaintiff's First Motion for Partial Summary Judgment (Doc. 87). The motion is fully briefed, and the Court is prepared to rule. For reasons explained below, Plaintiff's Motion for Partial Summary Judgment is denied.

**I.    Legal Standard Governing Summary Judgment Motions**

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[1] For the purpose of reviewing a summary judgment motion, a factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[2] A "genuine" issue of fact exists where "there is sufficient evidence

---

[1] Fed. R. Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

on each side so that a rational trier of fact could resolve the issue either way."[3]

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[4]  To meet this standard, the moving party does not need to negate the claims of the opposing party; instead, the moving party can simply point out the absence of evidence for the opposing party on an essential element of that party's claim.[5]

If a moving party satisfies this initial burden, the burden shifts to the opposing party to "set forth specific facts" that would be admissible in evidence showing there is a genuine issue for trial and from which a rational trier of fact could find for the non-movant.[6]  In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[7]

## II.    Background / Facts

Plaintiff Digital Ally, Inc. ("Digital" or "Plaintiff") designs, manufactures, and distributes digital video systems.  Defendant Z3 Technology, LLC ("Z3" or "Defendant") is a computer engineering firm that designs and manufactures hardware modules for use in videographic products.  The modules, including related software and design information, are then licensed to Z3's

---

[3] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Liberty Lobby,* 477 U.S. at 248).

[4] *Id*. at 670–71.

[5] *Id*. at 671.

[6] *Id.*; *Liberty Lobby*, 477 U.S. at 248.

[7] *Applied Genetics Int'l v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

customers.

On or about January 2, 2009, Digital, through its Vice President of Engineering (Robert Haler), purportedly entered into a "Software/Hardware Design and Production License Agreement" denominated PLA-2009.01.02 ("PLA-2009") with Z3.[8]  According to Z3, under PLA-2009, it agreed to design, manufacture, and deliver to Digital certain hardware modules using the Texas Instruments DM365 computer chip and related software components for use in Digital's products.[9]  Z3 contends that PLA-2009 required Digital to place "guaranteed minimum orders" for 39,050 DM365 modules from Z3, gave Z3 a right of first manufacture with regard to DM365 modules, and also required Digital to pay certain royalties if it did not submit the guaranteed minimum orders.[10]

A substantial portion of Z3's work under the contract was to design DM365 modules pursuant to design details provided by Digital.[11]  Until Digital "provide[d] all necessary design details, Z3 could not design, manufacture and deliver the modules.[12]  PLA-2009 sets forth a design schedule, commencing in "Week 0" when Digital was to provide "all necessary design details" to Z3, and ending once Digital ordered, received, and tested sample units.[13]  Under the contract, this

---

[8] Z3's Statement of Facts ("SOF") ¶ 2 (disputed).  Digital contends Mr. Haler did not have authority to execute the contract on its behalf.

[9] Def.'s Mem. in Opp'n to Mot. for Partial Summ. J. (Doc. 99) at 1; *see also* Pl.'s Mot. for Summ. J., Ex. 1 (Doc. 89-1) ("PLA-2009").

[10] *Id*. at 2.

[11] Z3's SOF ¶ 7 (undisputed).

[12] *Id*. ¶¶ 8–9 (undisputed).

[13] PLA-2009 (Doc. 89-1) at 11.

design period would take 28 weeks.[14]  The design schedule did not require Z3 to deliver an initial sample until "Week 10 " of the contract, which could not have occurred until mid-March at the earliest.[15]  Z3 contends "Week 10" of the contract occurred much later because Digital did not provide all the necessary design details in "Week 0."[16]

During the "design period," Digital was obligated to pay $300,000 in fees according to the schedule set forth in PLA-2009, with the last payment being made in Week 28, when pre-production samples were available.[17]  Digital paid the first two fee installments under the contract: $75,000 in January 2009 and $50,000 in February 2009.[18]

Although Digital was substantially behind and delayed in providing Z3 with all necessary design details for the DM365 modules, the parties began working on the design of the DM365 module promptly after the contract was signed on January 2, 2009.[19]  From January 13, 2009 through April 8, 2009, both parties devoted engineering time and effort to designing the DM365 module.[20]

On April 10, 2009, Thomas Heckman, Digital's CFO, sent Aaron Caldwell, Z3's President, a letter purporting to terminate PLA-2009 pursuant to paragraph 3 thereof, "effectively

---

[14] *Id.*

[15] Z3's SOF ¶ 10 (undisputed).

[16] *Id.* ¶ 11.  Digital indicates it cannot admit or deny this purported fact.

[17] PLA-2009 (Doc. 89-1) at 11.

[18] Pl.'s Statement of Uncontroverted Facts ("Digital's SUF") (Doc. 89) ¶ 19 (undisputed).

[19] Z3's SOF ¶ 14 (undisputed).

[20] *Id.* ¶¶ 13–14 (undisputed).

immediately."[21]  Digital also directed Z3 to "cease all activity" with respect to PLA-2009.[22]  Mr. Caldwell had follow up conversations with Stan Ross, Digital's Chief Executive Officer, Mr. Heckman, and Steve Phillips, Digital's new Vice President of Engineering, regarding the April 10 letter by phone, by e-mail, and in person.[23]  During these communications, Digital made it clear it would stand by its "termination" letter and its direction that Z3 cease all work on the DM365 module.[24]  In light of these developments, Z3 stopped working on the DM365 module.[25]  No hardware or software were ever produced for Digital pursuant to PLA-2009.[26]

Z3 contends Digital's wrongful termination and its direction to Z3 to "cease all activity" under PLA-2009 were the only reasons Z3 stopped working on the DM365 modules.[27]  Z3 believes it would have been able to complete the design of the module and exercise its right of first manufacture under PLA-2009.[28]

In Count I of its Amended Counterclaim, Z3 alleges Digital breached PLA-2009 by failing to place a "guaranteed minimum" order of 39,050 DM365 modules or pay an equivalent royalty. Z3 seeks "loss of profits" on the sale of 39,050 modules.  Digital moves for summary judgment on Count I because it contends there were unfulfilled conditions precedent and because Z3 has

---

[21] *Id*. ¶¶ 39–40 (undisputed).

[22] *Id*. ¶ 40 (undisputed).

[23] *Id*. ¶ 42 (undisputed).

[24] *Id*.

[25] *Id*.

[26] Digital's SUF ¶ 57 (undisputed).

[27] Z3's SOF ¶ 43.  Digital indicates it cannot admit or deny this purported fact.

[28] *Id*. ¶ 44.  Digital indicates it cannot admit or deny this purported fact.

insufficient evidence of lost profits.

## III. Analysis

### A. Choice of Law

In diversity actions, a federal court applies "the choice of law principles of the state in which it sits."[29]  Kansas case law recognizes the principle of freedom to contract and, under most circumstances, permits parties to choose the law applicable to their contract.[30]  Accordingly, where the parties to a contract have entered into an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement.[31]  However, where the application of the contracting parties' choice of law provision engenders a result contrary to public policy, Kansas courts will not apply another state's law.[32]

PLA-2009 states: "This Agreement will be governed by and interpreted in accordance with the laws of the State of Nebraska, without reference to conflict of laws principles."[33]  Both parties appear to agree that Nebraska law applies.  Further, neither party has argued there are public policy concerns that dictate a different result.  The Court will apply Nebraska law.[34]

### B. Waiver of Conditions Precedent

---

[29] *Morrison Knudsen Corp. v. Group Improvement Techniques, Inc.*, 532 F.3d 1063, 1077 n.12 (10th Cir. 2008).

[30] *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 374 (Kan. 2002).

[31] *Id.* at 375; *Venture Commercial Mortgage, LLC v. FDIC*, No. 09-2285-KHV, 2010 WL 820711, at *5 (D. Kan. Mar. 5, 2010).

[32] *Brenner*, 44 P.3d at 375.

[33] PLA-2009 (Doc. 89-1).

[34] *See Venture Commercial Mortgage*, 2010 WL 820711, at *5 (applying Arizona law because the loan agreement provided that it would be governed by Arizona law).

In its motion for summary judgment, Digital argues PLA-2009 contains three conditions precedent that were never satisfied.  Z3 argues Digital waived any argument there were unsatisfied conditions precedent because, in its answer, Digital did not deny with particularity that any conditions precedent had occurred or been performed.  Digital contends it may raise this issue for the first time in a motion for summary judgment without having specifically identified those unfulfilled conditions in its answer.

Fed. R. Civ. P. 9(c) states, "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed.  But when denying that a condition precedent has occurred or been performed, a party must do so with particularity."  "A party who intends to controvert the claimant's general allegation of performance or occurrence thus is given the burden of identifying those conditions that the denying party believes are unfulfilled and wishes to put into issue."[35]  The denying party cannot raise an issue of nonperformance or nonoccurrence of conditions precedent by a general denial.[36]

Paragraph 36 of Defendant's Amended Counterclaim alleges that Z3 "performed all conditions precedent in PLA-2009."[37]  Paragraph 36 of Plaintiff's Reply to Amended Counterclaim merely states, "Digital denies the allegations contained in ¶ 36 of the Amended Counterclaim."[38]

---

[35] 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1304 (3d ed. 2004).

[36] *Id*.

[37] Am. Countercl. (Doc. 62).

[38] Reply to Am. Countercl. (Doc 68).

Thus, Plaintiff pleaded only a general denial and did not deny with "particularity" that any specific condition precedent had been fulfilled.

The Court has found only one Tenth Circuit case discussing Rule 9(c)'s requirement that a party specifically deny fulfillment of a condition precedent with particularity. In *Lumbermens Mutual Insurance Co. v. Bowman*, the appellees, Robert Bowman and Walter Lewis, sued appellant, Lumbermens Mutual Insurance Company, to recover amounts due under a fire insurance policy.[39] Under New Mexico law, the filing of a proof of loss with the insurer by the insured was a condition precedent to the insurer's liability on the policy.[40] Appellant argued it was entitled to a directed verdict on the complaint because no proof of loss was ever filed by appellees.[41]

The Tenth Circuit rejected appellant's argument.[42] It held that appellees complied with Fed. R. Civ. P. 9(c) by averring generally in their complaint that they had fully complied with all of the terms and conditions of the policy.[43] The Tenth Circuit then determined that appellant did not comply with Fed. R. Civ. P. 9(c) because, in its answer, appellant only generally denied that the terms and conditions of the policy had been complied with and did not specifically and with particularity deny the filing of a proof of loss.[44] Based upon appellant's failure to deny the fulfillment of a condition precedent with particularity, the Tenth Circuit held that whether the

---

[39] *Lumbermens Mut. Ins. Co. v. Bowman*, 313 F.2d 381, 383 (10th Cir. 1963).

[40] *Id*. at 387.

[41] *Id*.

[42] *Id*.

[43] *Id*.

[44] *Id*.

condition had been complied with was not an issue in the case and no evidence in connection therewith should have been received.[45] This case, however, is not entirely on point because appellant in *Lumbermens* did not attempt to raise the issue in a summary judgment motion before trial.

Various courts from other jurisdictions have held that when a party does not deny with particularity, in its answer, that a condition precedent has been fulfilled, it is precluded from subsequently raising that issue. For example, in *Myers v. Central Florida Investments*, the plaintiff alleged in her complaint that she had fulfilled a condition precedent to her claim by filing a timely charge with the EEOC before filing suit.[46] In its answer, the defendant generally denied the allegations in this paragraph.[47] The court held that the defendant's general denial did not meet the particularity requirements of Fed. R. Civ. P. 9 and stated, "Should a defendant 'not deny the satisfaction of the conditions precedent specifically and with particularity, however, the allegations are assumed admitted and cannot later be attacked.'"[48] Other courts have followed a similar approach.[49] Plaintiff, however, cites authority from other jurisdictions indicating a party may deny

---

[45] *Id.*

[46] *Myers v. Cent. Florida Invs.*, 592 F.3d 1201, 1224 (11th Cir. 2001).

[47] *Id.*

[48] *Id.* (citations omitted). The Court in *Myers* ultimately determined that defendants' answer gave plaintiff ample notice that defendants believed that she had failed to timely file a complaint with the EEOC because defendants listed the failure of a condition precedent as an affirmative defense. *Id.* at 1225.

[49] *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1009 (11th Cir. 1982) ("If the party does not deny the satisfaction of the conditions precedent specifically and with particularity, however, the allegations are assumed admitted and cannot later be attacked); *EEOC v. Serv. Temps, Inc.*, No. 08-CV-1552-D, 2010 WL 1644909, at *4 (N.D. Tex. Apr. 22, 2010) (holding that defendant was precluded from arguing failure of a condition precedent as a basis

the performance of a condition precedent by summary judgment motion as well as by answer.[50]

As discussed above, the Tenth Circuit has not addressed this issue in the context of being presented initially in a summary judgment motion, and there appears to be conflicting authority from other jurisdictions. The Court believes that under certain circumstances, allowing a party to raise the issue of unsatisfied conditions precedent for the first time in a motion for summary judgment could nullify the purposes of Rule 9 and unfairly surprise or prejudice the opposing party. Here, however, the Court does not find Z3 would be unfairly prejudiced or surprised.

Digital filed its answer to Z3's Amended Counterclaim on November 18, 2009, more than six months ago. Since that time, the parties have engaged in written discovery and deposed various individuals. Because it was not alerted to Digital's argument, Z3 contends it has not conducted any discovery on this issue. Upon motion by the parties, the Court, however, has recently extended various case deadlines, including extending the discovery deadline until October 28, 2010.[51] To the extent there are factual issues that bear upon this issue, Z3 will have sufficient time to engage in further discovery. Additionally, as will be discussed below, the Court can resolve whether PLA-

---

for summary judgment because "[w]hen a party fails to specify in its operative pleading (typically an answer to a complaint) the particular condition precedent that has not been fulfilled, it can be precluded from taking that position during the litigation."); *Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360, 1368–70 (D. Ga. 2002) (holding defendant waived its right to argue plaintiff failed to satisfy condition precedent because defendant made only a general denial in its answer and did not raise the issue until filing a motion for summary judgment more than two years after the case was filed).

[50] *See, e.g.*, *Associated Mech. Contractors v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1317 (11th Cir. 2001) ("The specific denial of performance of conditions precedent may be raised by motion as well as by answer."); *EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981); *Heights Driving School, Inc. v. Top Driver, Inc.*, 51 Fed. Appx. 932, 940 (6th Cir. 2002) (unpublished); *Stearns v. Consol. Mgmt., Inc.*, 747 F.2d 1105 (7th Cir. 1984).

[51] Order (Doc. 110).

2009 contains any conditions precedent by analyzing the plain text of the contract, without the need for any extrinsic evidence.  As a result, Digital is not precluded from arguing in the instant motion that PLA-2009 contains unsatisfied conditions precedent.

C.     Conditions Precedent in PLA-2009

Digital argues the following clauses in PLA-2009 contain conditions precedent that were never satisfied: (1) the Preamble; (2) Paragraph 14(b)(iii)(1); and (3) Paragraph 14(b)(iv).

1.     Rules for Interpreting Contracts under Nebraska Law

In interpreting a contract under Nebraska law, courts must first determine, as a matter of law, whether the contract is ambiguous.[52]  A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[53]  A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.[54]  If the contents of the document are not ambiguous, the document is not subject to interpretation and will be enforced according to its terms.[55]

2.     Conditions Precedent Generally

---

[52] *Estate of Stine v. Chambanco, Inc.*, 560 N.W.2d 424, 428 (Neb. 1997).

[53] *Id.*

[54] *Id.*

[55] *Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha*, 540 N.W.2d 101, 105 (Neb. 1995).

"'A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'"[56]  A condition precedent is either a condition which must be performed before a contract becomes binding upon the parties to it or must be fulfilled before a duty arises to perform the obligations of an already existing contract.[57] A promise, on the other hand, occurs when one expresses an intention that some future performance will be rendered and gives assurance of its rendition to the promise.[58]  "In the event of nonfulfillment, the distinction between a promise and a condition becomes important."[59]  As a general rule, a condition must be exactly fulfilled before liability can arise on the contract.[60] Nonfulfillment of a promise, however, is a breach of contract and creates a right to damages.[61]

Under Nebraska law, there is a "strong presumption that a written instrument correctly expresses the intention of the parties to it."[62]  The existence of a condition precedent depends upon the intent of the parties as gathered from the words they have employed.[63]  Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," and "on condition that" and similar

---

[56] *Harmon Cable Commc'ns of Neb. Ltd. P'ship v. Scope Cable Television, Inc.*, 468 N.W.2d 350, 358–59 (Neb. 1991) (citing Restatement (Second) of Contracts § 224 (1981)).

[57] *Omaha Public Power Dist. v. Employers' Fire Ins. Co.*, 327 F.2d 912, 915 (8th Cir. 1964) (citing *O'Brien v. Fricke*, 27 N.W.2d 403 (Neb. 1947)).

[58] *Harmon*, 468 N.W.2d at 359 (citation omitted).

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Artex, Inc. v. Omaha Edible Oils, Inc.*, 436 N.W.2d 146, 150 (Neb.1989).

[63] *Estate of Stine v. Chambanco, Inc.*, 560 N.W.2d 424, 428 (Neb. 1997).

phrases are evidence that performance of a contractual obligation is a condition.[64] Where the intent of the parties is not clear, the disputed language is generally deemed to be promissory rather than conditional.[65]

    3.    Preamble to PLA-2009

The Preamble to Contract PLA-2009 states, "By installing, copying or otherwise using the Licensed Materials, LICENSEE agrees to abide by the following provisions." Neither party contends the Preamble to Contract PLA-2009 is ambiguous, and the Court agrees.[66] The parties, however, dispute whether the Preamble contains a condition precedent.

Digital contends the Preamble creates a condition precedent that Digital agreed to be bound by the provisions of PLA-2009 *only* if Digital uses the Licensed Materials. Digital, however, reads the term "only" into the sentence at issue. The Preamble contains no such conditional language. It merely states certain consequences of Digital's use of Licensed Materials; it nowhere states these consequences occur *only* if Digital uses the Licensed Materials as Digital suggests. Based upon the absence of any conditional language in the Preamble, the Court finds the parties did not intend to create a condition precedent.[67]

---

[64] *Id.*

[65] *Harmon*, 468 N.W.2d at 359.

[66] Because the Court finds the contract to be unambiguous, it will not consider any extrinsic evidence in interpreting its terms. *See Davenport Ltd. P'ship v. 75th & Dodge I, L.P.*, 780 N.W.2d 416, 423 (Neb. 2010).

[67] *Harmon*, 468 N.W.2d at 359–60 (holding that the absence of any language indicative of a condition precedent precludes a finding the parties clearly intended to a condition precedent); *cf. Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha*, 540 N.W.2d 101, 105 (Neb. 1995) (finding the phrase "as a condition for" was intended to create a condition precedent).

A contract must also receive a "reasonable construction, and [the Court] must construe it as a whole and, if possible, give effect to every part of the contract."[68] PLA-2009 specifies that Digital would pay a fee of $75,000 upon execution of the license agreement and $50,000 during the first week of February, 2009.[69] The design schedule set forth in paragraph 12 does not require Z3 to deliver an initial sample of the modules until Week 10 of the contract, or until mid-March 2009.[70] It does not appear Digital would agree to make these payments if it were not obligated under the contract until and unless it installed, copied, or otherwise used modules that were not yet in existence.

Additionally, PLA-2009 is entitled a "Software/Hardware Design and Production License Agreement." Under PLA-2009, Z3 was to design DM365 modules and related software for Digital pursuant to a fee, license these materials to Digital, and then manufacture and ship the materials.[71] It does not appear Z3 would invest time and money into designing and manufacturing the DM365 modules if there were no binding contract to do so.

### 4. Excuse of Condition Precedent in Preamble

Even assuming Digital's obligations under PLA-2009 were dependent upon its installing, copying, or using the License Materials, Z3 argues this condition precedent would be excused because Digital prevented the condition from occurring. Under Nebraska law, a condition is excused if the occurrence of the condition is prevented by the party whose performance is dependent

---

[68] *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 132 (Neb. 2008).

[69] PLA-2009 (Doc. 89-1) at 11.

[70] *Id*; Z3's SOF ¶ 10 (undisputed).

[71] PLA-2009 (Doc. 89-1).

upon the condition.[72]  "That person must put forth a good faith effort to obtain the condition."[73] Additionally, if a promisor prevents or hinders the occurrence of a condition precedent, the condition is excused.[74]

Z3 claims Digital's own actions prevented Digital from being able to install, copy, or otherwise use the Licensed Materials.  For example, On April 10, 2009, Thomas Heckman, Digital's CFO, sent Aaron Caldwell, Z3's President, a letter purporting to terminate PLA-2009 pursuant to paragraph 3 thereof, "effectively immediately."[75]  Digital also directed Z3 to "cease all activity" with respect to PLA-2009.[76]  Mr. Caldwell had follow up conversations with Stan Ross, Digital's Chief Executive Officer, Mr. Heckman, and Steve Phillips, Digital's new Vice President of Engineering, regarding the April 10 letter by phone, by e-mail, and in person.[77]  During these communications, Digital made it clear it would stand by its "termination" letter and its direction that Z3 cease all work on the DM365 module.[78]  In light of these developments, Z3 stopped working on the DM365 module.[79]

Digital counters there is sufficient evidence to demonstrate it made a good faith effort to obtain the conditions precedent.  In support of this, Digital cites to various e-mail exchanges

---

[72] *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 457 (Neb. 1987).

[73] *Id.*

[74] *Id.*

[75] Z3's SOF ¶¶ 39–40 (undisputed).

[76] *Id.* ¶ 40 (undisputed).

[77] *Id.* ¶ 42 (undisputed).

[78] *Id.* (undisputed).

[79] *Id.* (undisputed).

between it and Z3, which purportedly show Digital's diligent efforts to assist Z3 in the design of the DM365 module from January 2009 through April 2009.

The issue of good faith and whether performance was prevented by an adverse party are questions of fact for a jury.[80] Z3 has provided sufficient evidence showing there is a genuine issue for trial and from which a rational trier of fact could find for it on this issue. Accordingly, even assuming the Preamble contains a condition precedent – which the Court has concluded it does not – Digital's motion for partial summary judgment would be denied because there are disputed issues of fact.

Digital also argues the non-occurrence of a condition precedent cannot be excused if occurrence of the condition was a material part of the agreed upon exchange. In support of this proposition, Digital cites the Nebraska Supreme Court's decision in *Lee Sapp Leaing, Inc. v. Catholic Archbishop of Omaha*.[81] However, the facts of *Lee Sapp Leasing* are distinguishable from the instant case. In *Lee Sapp Leasing*, the Nebraska Supreme Court was relying on the Restatement (Second) of Contracts § 229, which excuses the non-occurrence of a condition to the extent it would cause disproportionate forfeiture.[82] *Lee Sapp Leasing* did not involve an allegation that an adverse party had prevented a condition precedent from occurring,[83] and Digital cites no case applying *Lee Sapp Leasing* to such a situation. Additionally, comment b to Restatement (Second) of Contracts § 225 states that a condition precedent "may be excused by prevention or hindrance of its occurrence

---

[80] *Chadd*, 412 N.W.2d at 458.

[81] 540 N.W.2d 101 (Neb. 1995).

[82] *Id.* at 105.

[83] *See id.*

through a breach of the duty of good faith and fair dealing" without referring to any purported requirement that the condition not be a material part of the agreed upon exchange. As a result, Z3 is not prevented from arguing the non-occurrence of any condition precedent was excused by Digital's actions.

5.      Paragraph 14(b)(iii)(1)

Digital also argues Paragraph 14(b)(iii)(1) contains a condition precedent. Paragraph 14(b)(iii)(1) states in relevant part:

> iii)      Minimum 12,000 units or equivalent Royalty PER YEAR for 3 years.
>
> (1) LICENSEE will provide LICENSOR 1st opportunity to manufacture modules given LICENSOR'S per module pricing, quality, and delivery are competitive with alternative manufacturers, including consideration of royalty cost for non-Z3 manufactured modules.[84]

The Court interprets this provision to mean that Z3 had a contractual right to manufacture a minimum of 12,000 units per year for three years, or receive an equivalent royalty, provided its pricing, quality, and delivery schedule were competitive.

Digital argues that these rights to a "1st opportunity to manufacture" were conditioned on Z3's per module pricing, quality, and delivery being competitive, and that this condition cannot be fulfilled because no modules were ever manufactured. Z3 appears to concede this is a condition precedent. However, as discussed above, Z3 has submitted evidence that Digital prevented the condition from occurring by directing Z3 to cease all activity on the contract. The issue of whether performance was prevented by an adverse party are questions of fact for a jury.[85] Z3 has provided

---

[84] PLA-2009 (Doc. 89-1).

[85] *Chadd*, 412 N.W.2d at 458.

sufficient evidence showing there is a genuine issue for trial and from which a rational trier of fact could find for it on this issue.

6.  Paragraph 14(b)(iv)

Digital also contends Paragraph 14(b)(iv) contains a condition precedent. It states:

> If LICENSOR cannot provide on-time delivery, a price and quality acceptable to LICENSEE, or is not willing to produce [the module designed for Digital under this contract], then LICENSEE has the right to use alternative manufacturing. LICENSEE is liable for royalty of $7.50 per unit on modules actually SOLD BY LICENSEE on all modules not manufactured by Z3. If LICENEE [sic] does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to 12,000*$7.500 = $90,000 royalty per calendar year or the pro-rated balance if at least some units have been purchased within the fiscal year in question. Such payments will be Net 30 at the end of the fiscal year in question.

Focusing on the second sentence above, Digital argues the obligation to pay a royalty rate of $7.50 per unit, or $90,000 per year for three years, is conditioned on Digital actually selling products containing DM365 modules that were not manufactured by Z3. Because Digital did not sell any products containing DM365 modules, Digital contends the condition precedent did not occur.

The third sentence in Paragraph 14(b)(iv), however, is not conditioned on Digital selling any products containing DM365 modules. It plainly states, "If LICENCE [sic] does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to . . . $90,000 royalty per calendar year." Under this sentence, Digital is obligated to pay $90,000 per year for a period of three years if it did not order a minimum number of units. There is no condition that Digital sell any products containing DM365 to trigger this obligation. This interpretation is consistent with Paragraph 14(b)(iii), which states the minimum order quantity is

"12,000 units or equivalent Royalty PER YEAR for 3 years" without reference to Digital selling products containing the DM365 modules. Accordingly, the Court finds that Digital's obligation to pay an equivalent royalty if it did not purchase the minimum number of units is not conditioned upon Digital selling products containing DM365 modules.

      D.     <u>Lost Profits as Damages for Breach of PLA-2009</u>

          1.     Nebraska Uniform Commercial Code

As discussed above, Z3 seeks "loss of profits" on the sale of 39,050 modules. Digital moves for summary judgment arguing loss of profits is not the proper method of damages under Nebraska Uniform Commercial Code ("Nebraska UCC") sections 2-610 and 2-708, and that Z3 has insufficient evidence of lost profits.

The Court must first determine whether Article 2 of the Nebraska UCC applies to PLA-2009. Digital argues Article 2 of the Nebraska UCC applies to all "transactions in goods" and that the "Licensed Materials" under PLA-2009 constitute "goods" within the meaning of the UCC.

Most courts to have considered the issue have held that computer software qualifies as a "good" under Article 2 of the UCC.[86] Here, Z3 appears to concede the "Licensed Materials" are

---

[86] *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3d Cir. 1991) (holding that software fits within the definition of "good" in the UCC and commenting that the majority of academic commentary espouses this view); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (applying the UCC to sale of custom software under New Hampshire law); *ePresence, Inc. v. Evolve Software, Inc.*, 190 F. Supp. 2d 159, 163 (D. Mass. 2002) (under California law, applying UCC to sale of software programs, which the court considered to be goods); *Dahlmann v. Sulcus Hospitality Techs., Corp.*, 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999) (holding that agreements for software development fell within the UCC because the contracts were for "goods"); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996) ("Generally, software is considered a 'good,' even though a finished software product may reflect a substantial investment of programming services."); *Olcott Int'l & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind. Ct. App. 2003) (holding that generally available, standardized software is a good); *Newcourt Fin. USA, Inc. v. FT Mortgage Cos.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001) (considering custom software to be a good);

"goods." Rather, Z3 argues Article 2 of the Nebraska UCC does not apply because (1) it applies to only contracts for sale; and (2) PLA-2009 is a license agreement, not a sales contract.

Although Article 2 of the Nebraska UCC states it applies to "transactions in goods,"[87] the provisions relating to repudiation and damages are more narrowly defined. For example, Neb. UCC § 2-610 governs anticipatory repudiation of a "contract." A "contract" is limited to the present or future "sale of goods."[88] Neb. UCC § 2-708 sets forth a "seller's" damages for repudiation. A "seller" is "a person who sells or contracts to sell goods."[89] Further, courts in Nebraska have stated, "If a transaction is not for the sale of goods, the provisions of the U.C.C. do not apply to that transaction."[90] Thus, the Court agrees that PLA-2009 must involve a "sale" of goods to be governed by the Nebraska UCC.

_____

*Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 751 (Kan. 2006) ("Computer software is considered to be goods subject to the UCC even though incidental services are provided along with the sale of the software."); *Delorise Brown, M.D., Inc. v. Allio*, 620 N.E.2d 1020,1022 (Ohio Ct. App. 1993) ("Ohio courts have found that where both hardware and software are contained within a single agreement, both are considered to be 'goods' as defined in Article 2."). Courts have taken different approaches when the contract calls for the development of entirely new software. *Compare Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 353 (D. Me. 2003) (holding that developer's agreement to create software "from scratch" for which it would be paid on a time and materials basis was a contract for services, not goods) and *Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314, 318–19 (Ind. Ct. App. 1986) (contract for the development of a software program to meet a customer's specific needs was a contract for services, not goods) *with Dharma Sys., Inc.*, 148 F.3d at 654 (applying UCC to agreement to adapt proprietary software) and *Advent Sys. Ltd.*, 925 F.2d at 675 ("The fact that some programs may be tailored for specific purposes need not alter their status as 'goods' because the [UCC] definition includes 'specially manufactured goods.'").

[87] Neb. UCC § 2-102.

[88] Neb. UCC § 2-106.

[89] Neb. UCC § 2-103.

[90] *MBH, Inc. v. John Otte Oil & Propane, Inc.*, 727 N.W.2d 238, 245 (Neb. Ct. App. 2007).

Under the Nebraska UCC, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price."[91]  Paragraph 1 of PLA-2009 expressly states that it does *not* provide for the passing of title from Z3 to Digital:

> The Licensed Materials are protected by copyright laws, international copyright treaties, and trade secret laws, as well as other intellectual property laws and treaties.  The Licensed Materials are licensed, not sold to LICENSEE, and can only be used in accordance with the terms of this Agreement.  LICENSOR retains title and ownership of the Licensed Materials, including all intellectual property rights.[92]

The parties have not cited, nor has Court found, a Nebraska case addressing the precise issue of whether a licensing agreement constitutes a sale governed by the Nebraska UCC.[93]  There is authority from at least one other jurisdiction that supports Z3's argument.  In *Berthold Types Ltd. v. Adobe Systems, Inc.*, the court held that the transaction in dispute was not subject to the UCC because it involved only granting a license and not a sale of goods.[94]  In that case, the plaintiff licensed computer typefaces to defendant, which defendant then included in its own software.[95]  Similar to the Nebraska UCC, the Illinois UCC defined sale as the "passing of title from the seller to the buyer for a price."[96]  The court held the UCC did not apply because there was no transfer of

---

[91] Neb. UCC § 2-106.

[92] PLA-2009 (Doc. 89-1).

[93] In *Design Data Corp. v. Maryland Cas. Co.*, 503 N.W.2d 552 (Neb. 1993), the Nebraska Supreme Court analyzed whether a contract for the sale of hardware, an accompanying software license, and installation and training services was predominantly a contract for goods or services.  The issue of whether a license agreement constitutes a "sale" was not before the court.

[94] *Berthold Types Ltd. v. Adobe Sys., Inc.*, 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000).

[95] *Id*. at 697.

[96] *Id*. at 698.

title in the license agreement.[97]  It stated, "A pure license agreement, like the [one at issue], does not involve transfer of title, and so is not a sale for Article 2 purposes."[98]  Emphasizing that title does not transfer in a software license agreement, another court has stated, "Admittedly, the UCC technically does not govern software licenses . . ." and that "software licenses exist in a legislative void."[99]

Digital has not cited any authority to the contrary or distinguished *Berthold Types Ltd. v. Adobe Systems, Inc.*  As a result, the Court will interpret PLA-2009 according to its plain terms – that the parties intended PLA-2009 to be a license agreement in which title does not pass from Z3 to Digital.  Because title to the "Licensed Materials" was not transferred, PLA-2009 is not governed by Article 2 of the Nebraska UCC.

### 2.  Sufficient Financial Data

As discussed above, Digital argues Z3 has insufficient financial data to support a claim for lost profits under Neb. UCC § 2-708(2).  Both parties cite various Nebraska cases holding that a claim for lost profits must be supported by some financial data and that lost profits cannot be established by speculative evidence.[100]  These cases, however, do not involve claims for lost profits

---

[97] *Id.*

[98] *Id.*

[99] *I.Lan Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 331–32 (D. Mass. 2002).  In *I.Lan Sys.*, the court ultimately applied the UCC because the court concluded the UCC "best fulfill[ed] the parties' reasonable expectations."  *Id.* at 332.

[100] *See Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 639 (Neb. 2008) (cited by Z3); *Evergreen Farms v. First Nat'l Bank & Trust Co.*, 553 N.W.2d 728, 733 (Neb. 1996) (cited by both parties); *Thille & Son Constr., Inc. v. Thille*, No. A-04-034, 2005 WL 2129167, at *7 (Neb. Ct. App. Sept. 6, 2005) (cited by both parties).

under the Nebraska UCC, but rather involve claims under Nebraska common law.[101]  Thus, even though the Nebraska UCC does not apply to PLA-2009, Z3 must still support any claim for lost profits with sufficient financial data.  Accordingly, the Court will still address Digital's argument that Z3 has insufficient evidence to support a claim for lost profits.

As an initial matter, the Court finds this issue to be premature.  The Court recently extended discovery until October 28, 2010.  Therefore, both parties have additional time in which to develop evidence relating to damages.

In a breach of contract case, the goal of a damages award is to put the injured party in the same position it would have occupied if the contract had been performed.[102]  One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach.[103]  Although damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural.[104]  There is no precise formula for determining lost profits, and the only requirement in Nebraska is that the calculation be supported by some financial data which would permit an estimate of the actual loss to be made with reasonable certitude and exactness.[105]

---

[101] Thus, Z3 is still required to support any claim for lost profits with some financial data even if the Neb. UCC does not apply to PLA-2009 by virtue of it being a license agreement.

[102] Neb. UCC § 1-305 ("The remedies provided by the Uniform Commercial Code must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . ."); *see also Aon Consulting, Inc.*, 748 N.W.2d at 639.

[103] *Aon Consulting, Inc.*, 748 N.W.2d at 639.

[104] *Id.*

[105] *Id.* at 643.

In *Holiday Manufacturing Co. v. B.A.S.F. Systems, Inc.*, the court calculated plaintiff's lost profits under Neb. UCC § 2-708(2) by subtracting plaintiff's cost to manufacture the goods from the contract price of the goods and then multiplying that figure by the number of goods to be produced under the contract.[106] In that case, the contract price per good was $.14144 and the cost to plaintiff of producing each good was $.13045, resulting in a profit of $.01099 per good.[107] The court then multiplied $.01099 by the number of goods to be produced under the contract (4,500,000) to determine a lost profit of $49,455.00.[108]

Z3 proposes a similar calculation as that used in *Holiday Manufacturing*. Z3 proposes calculating its net profits using the contract price of the modules, less the cost of manufacture, less allocable overhead, multiplied by the number of modules to be sold under the contract.

PLA-2009 called for the manufacture of 39,050 modules under the following price structure:

| | |
|---|---|
| 50 sample units @ $200 per unit[109] | $10,000 |
| 3,000 initial production units @ $100 per unit[110] | $300,000 |
| 36,000 units @ estimated target price of $100 per unit[111] | $3,600,000 |
| Total | $3,910,000 |

---

[106] *Holiday Mfg. Co. v. B.A.S.F. Sys., Inc.*, 380 F. Supp. 1096, 1105 (D. Neb. 1974).

[107] *Id.*

[108] *Id.*

[109] PLA-2009 (Doc. 89-1) at 11–12.

[110] *Id.* at 12.

[111] *Id.*

Z3 contends the cost to manufacture the DM365 module is approximately $31.95 per unit. Using this figure, the total cost to manufacture the DM365 modules would be calculated as follows:

| | |
|---|---|
| 50 sample units | $1,597.50 |
| 3,000 initial production units | $95,850[112] |
| 36,000 units | $1,150,200 |
| Total | $1,247,647.50 |

Subtracting the total cost of manufacture ($1,247,647.50) from the contract price of the goods ($3,910,000) results in lost profits of $2,662,352.50, without adjusting for allocable overhead.

Digital challenges Z3's reliance on the "estimated" target price of $100 for the "minimum" order of 36,000 units, arguing it is inaccurate because the parties contemplated the price could change over time. PLA-2009 provides that the "ESTIMATED TARGET" for the 36,000 modules is $100/module "assuming similar PCB layer, component and architecture to Z3-DM355-MOD-SP2."[113] It further states, "FINAL PER/MODULE PRICE WILL BE AGREED AFTER COMPLETION OF FINAL HARDWARE DESIGN AND SUBMISSION OF FINAL BOM TO LICENSEE. Specialized components may affect this pricing. Pricing is reviewed between LICENSOR and LICENSEE every 90 days."[114]

Digital cites no authority that lost profits cannot be awarded when a price term is not finalized. Although the Nebraska UCC does not apply to this transaction, the Court finds some of its reasoning to be persuasive on this issue. Under the Nebraska UCC, a contract does not fail if

---

[112] In its opposition, Z3 calculates the cost to manufacture the 3,000 initial production units as $395,850.00. This appears to be an error. 3,000 x $31.95 = $95,850.

[113] PLA-2009 (Doc. 89-1) at 12.

[114] *Id.*

terms are left open as long as there is a "reasonably certain basis for granting a remedy."[115]  Under

Neb. UCC § 1-305, "[t]he remedies provided by the Uniform Commercial Code must be liberally

administered . . ."  Recognizing that a party's difficulty in quantifying damages often flows from the

other party's breach, the philosophy of the UCC is to require that degree of proof of damages which

the facts permit, but no more.[116]  The official comments to UCC section 1-305 state that the purpose

of this provision is to "reject any doctrine that damages must be calculable with mathematical

accuracy.  Compensatory damages are often at best approximate:  They have to be proved with

whatever definiteness and accuracy the facts permit, but no more."[117]

Based upon the evidence before it, the Court cannot conclude the parties' own estimated

target price is unreliable or not a reasonably certain basis for calculating lost profits.  Digital may

develop appropriate evidence showing this target price is unreliable or speculative but there is no

such evidence before the Court at this time.

Digital also challenges Z3's evidence of the cost to manufacture the DM365 modules.  Z3

appears to outsource the manufacture of modules.[118]  Therefore, Z3 contends its manufacturing costs

would be the net cost per unit charged by its manufacturer.  Z3 produced the following evidence to

support its estimated manufacturing cost of $31.95 per unit:

> Invoice dated April 6, 2009 to Z3 from its manufacturer for a DM365
> module at a unit price of $35.00;

---

[115] Neb. UCC § 2-204(3).

[116] *Bead Chain Mfg. Co. v. Saxton Prods., Inc.*, 439 A.2d 314, 320–21 (Conn. 1981).

[117] Neb. UCC § 1-305.

[118] Z3's SOF ¶ 51; Caldwell Aff. (Doc. 99-6) ¶¶ 19–20.  Digital indicates it is unable to admit or deny this fact.

Invoice dated April 17, 2009 to Z3 from its manufacturer for a DM365 module for a unit price of $35.00;

A purchase order from Z3 to its manufacturer for a DM365 module for a unit price of $40.878;

A purchase order from Z3 to its manufacturer for a DM365 module for a unit price of $25.412;

A bill of materials prepared by Z3 dated April 7, 2009 for the DM365 module that is the subject of PLA-2009, showing the several dozen individual components of the Digital DM365 module, coming to a cost per unit of $31.95025;

Invoice dated March 6, 2009 to Z3 from its manufacturer for two models of the DM355 module, which are purportedly similar to the DM365 module that is the subject of PLA-2009. This invoice shows a cost per unit for the two models of $30.614 and $27.85.[119]

Apart from the April 7, 2009 bill of materials, the invoices and bill of materials produced by Z3 appear to be for DM365 or DM355 modules manufactured for other entities, not Digital. The Court cannot determine at this juncture if these documents are a reliable source of determining the manufacturing cost of the DM365 module for Digital because there is no evidence the modules reflected in these invoices use the same or similar components that would have been used in the DM365 module for Digital.

Digital also takes issue with some of the figures underlying the April 7, 2009 bill of materials, which reflect a cost of $31.95 per unit. Bruno Marchevsky of Z3 prepared a majority of the April 7, 2009 bill of materials from "historical information," meaning he utilized information from prior bills of materials from the factory that manufactures modules for Z3.[120] In researching

---

[119] Z3's SOF ¶ 56. Digital indicates it is unable to admit or deny this fact.

[120] Digital's SUF ¶¶ 87–88 (undisputed) (Ex. 10:224:14 – 225:25).

a given component, Mr. Marchevsky consulted prior quotes from the factory for that component.[121] Additionally, Mr. Marchevsky priced some items on the bill of materials based upon the retail or catalog price, rather than the less expensive wholesale price.[122]

Mr. Marchevsky did not compile all of the information contained within the bill of materials.[123] Specifically, he did not price the components from Texas Instruments in this manner because Z3 has special pricing agreements with Texas Instruments.[124] Although he was not certain, he was "pretty sure" Mr. Caldwell completed the bill of materials for these items and that the prices came from an agreement with Texas Instruments or the factory that manufactures the components for Z3.[125]

Plaintiff cites no authority or offers any reason why the information contained within the bill of materials is unreliable or not based upon "financial data." On the contrary, the information contained within the bill of materials is based upon financial data such as prior quotes for similar components, costs from the manufacturing factory, and agreements between Z3 and Texas Instruments for certain components. Accordingly, the Court finds the April 7, 2009 bill of materials constitutes some "financial data" and, at this time, provides a reasonably certain basis for calculating the cost of manufacture. Plaintiff may develop and present evidence showing the information is unreliable but there is no such conclusive evidence currently before the Court.

---

[121] *Id*. ¶ 88 (undisputed) (Ex. 10:225:8–25).

[122] *Id*. ¶ 93 (undisputed) (Ex. 10:230:18–23). By utilizing a more expensive price in its bill of materials, Z3 was essentially reducing its net profit on the modules.

[123] *Id*. ¶¶ 94–95 (undisputed) (Ex. 10:231:6–233:17).

[124] *Id*. ¶ 94 (undisputed) (Ex. 10:231:6–10).

[125] *Id*. ¶ 94 (undisputed) (Ex. 10:231:19–233:17).

There is some question whether the April 7, 2009 bill of materials was actually created on April 7, 2009. Digital also contends it was never provided with a bill of materials during the time in which PLA-2009 was purportedly in effect. Z3 explains that it does not typically prepare a bill of materials for its customers and Digital purportedly repudiated PLA-2009 before there was any need to prepare a bill of materials. The fact that the bill of materials might not have been contemporaneously prepared does not necessarily indicate the information contained therein is unreliable.

Digital also contends that some of underlying source materials for the bill of materials were not produced for review in this litigation. The appropriate procedure is to file a motion to compel if Digital believes this information should have been produced or to serve an additional request for production of documents. This does not indicate the information contained within the bill of materials is speculative or unreliable.

Z3 also submitted evidence in the form of financial data of its overhead. Z3's contends its overhead is comprised of its business expenses other than the cost of manufacture.[126] Z3 has produced profit and loss statements for calendar year 2007, calendar year 2008, and January through October 7, 2009.[127] These statements break down all expenses of Z3, including all overhead expenses, by account, such as insurance, marketing and advertising, office expense, professional fees, rent, and research and development, among others.[128] Although Z3 has not yet determined

_____

[126] SOF ¶ 60. Caldwell Aff. (Doc. 99-6) ¶ 21. Digital indicates it is unable to admit or deny this. Digital has not provided any evidence or argument to the contrary.

[127] *Id.*

[128] *Id.*

what portion of these overhead expenses are properly allocable to its lost profit analysis, data for such a calculation appears to have been produced in these profit and loss statements.[129]

Because the revenue portion of the profit and loss statements was redacted, Digital argues it cannot determine whether Z3 was profitable as a whole. Z3's profitability as an organization does not appear to be relevant to determining its damages from Digital's purported breach of PLA-2009. In a breach of contract, the goal of a damages award is to put the injured party in the same position it would have occupied if the contract had been performed.[130] Thus, the relevant inquiry is whether Z3 would have made a net profit on the contract at issue, not the profit (or losses) Z3 might have incurred from its entire business.[131] The Court concludes Z3 has presented sufficient evidence of lost profits to create a triable issue of fact.[132]

---

[129] It is not yet clear to the Court which overhead expenses should be deducted from the contract price in determining lost profits. One commentator has suggested that, in determining lost profits, only variable expenses are deducted from the contract price, not fixed expenses such as utilities. *See* Roy Ryden Anderson, *Damages for Sellers Under the Code's Profit Formula*, 40 Sw. L.J. 1021, 1044–49 (Nov. 1986).

[130] *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 639 (Neb. 2008); *see also* Neb. UCC § 1-305 ("The remedies provided by the Uniform Commercial Code must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . .").

[131] *See Holiday Mfg. Co. v. B.A.S.F. Sys., Inc.*, 380 F. Supp. 1096, 1105 (D. Neb. 1974) (calculating plaintiff's lost profits under Neb. UCC § 2-708(2) without regard to plaintiff's revenue as an entire organization); *see also* Roy Ryden Anderson, *Damages for Sellers Under the Code's Profit Formula*, 40 Sw. L.J. 1021, 1062 (Nov. 1986) ("[T]he lost profit formula under section 2-708(2) is not a remedy for general business losses, but is only a recovery for the profit lost on the particular breached contract. The seller need only show its contract price and the direct costs it would have incurred on that particular contract.").

[132] The Court expresses no opinion whether the amount of lost profits claimed by Z3 is the appropriate measure of damages. Under the Court's interpretation of PLA-2009, Digital was required to place a minimum guaranteed order of 12,000 modules per year, for a three year period, at an estimated price of $100 per module or pay an equivalent royalty of $90,000 per year for a three year period. Neither party has addressed whether paying a royalty of $270,000 would

## IV. Conclusion

Based upon the intent of the parties, the Court finds the Preamble to PLA-2009 does not contain a condition precedent that Digital agreed to be bound by the provisions of PLA-2009 *only* if it used the Licensed Materials. Additionally, under Paragraph 14(b)(iv) of PLA-2009, Digital's obligation to pay an equivalent royalty if it did not purchase the minimum number of units is not conditioned upon Digital selling products containing DM365 modules. Although Paragraph 14(b)(iii)(1) of PLA-2009 appears to contain a condition precedent, Z3 has provided sufficient evidence to create a triable issue of fact as to whether Digital prevented the condition from occurring. Z3 has also presented sufficient financial data to create a triable issue of fact on its purported lost profits.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's First Motion for Partial Summary Judgment (Doc. 87) is hereby denied.

**IT IS SO ORDERED.**

Dated this 30th day of September, 2010, at Topeka, Kansas.

s/ K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge

---

be a sufficient measure of damages such that Z3 would be put in the same position had Digital performed under the contract.