IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC.,                          )
                                             )
            Plaintiff and Counterdefendant,  )
                                             )
v.                                           )     Case No. 09-2292-KGS
                                             )
Z3 TECHNOLOGY, LLC,                          )
                                             )
            Defendant and Counterplaintiff.  )

MEMORANDUM AND ORDER

This matter comes before the Court upon Plaintiff's Second Motion for Partial Summary

Judgment (ECF No. 160) and Defendant $Z^3$ Technology, LLC's Motion for Summary Judgment

(ECF No. 152).

This case involves two contracts for the design and manufacture of hardware modules using

Texas Instrument computer chips. On November 1, 2008, Plaintiff Digital Ally, Inc. ("Digital") and

$Z^3$ Technology, LLC ("$Z^3$") entered into a contract entitled Production License Agreement PLA-

2008.10.31 ("PLA-2008"). PLA-2008 called for $Z^3$ to design a DM355 module for use in Digital's

products and then manufacture and deliver to Digital 1,000 units along with the necessary software.

On January 2, 2009, Digital and $Z^3$ purportedly entered into a contract entitled Software/Hardware

Design and Production License Agreement ("PLA-2009"). Under PLA-2009, $Z^3$ agreed to design,

manufacture, and deliver to Digital DM365 hardware modules and related software components.

PLA-2009 purportedly required Digital to pay $300,000 in fees to $Z^3$ and to order at least 39,050

modules.

In Count I of its Complaint, Digital alleges that $Z^3$ breached PLA-2008 by delivering non-

conforming modules. In Counts II and III, Digital seeks a declaration that PLA-2009 was rescinded

and/or is void because the officer who signed PLA-2009 on behalf of Digital lacked authority to do so. Z[3] denies Digital's allegations and, in a counterclaim, asserts that Digital breached PLA-2009 (Count I) and PLA-2008 (Count II).

Digital has filed a motion for summary judgment on Counts II and III of its Complaint, seeking a determination that PLA-2009 is null and void for lack of authority. Alternatively, if the Court determines that PLA-2009 is an enforceable contract, Digital seeks a ruling that Z[3] is not entitled to recover any lost profits purportedly caused by Digital's failure to order at least 39,050 DM365 modules.

Z[3] requests that the Court enter summary judgment on Count I of its counterclaim and find that PLA-2009 is a valid and enforceable agreement that was breached by Digital. Z[3] asks the Court to enter judgment against Digital for $4,046,810.50 in damages, which includes lost profits from Digital's failure to order at least 39,050 DM365 modules. Z[3] also requests that the Court grant summary judgment against Digital on Count II of Z[3]'s counterclaim in the amount of $15,000.

For the reasons explained below, the Court grants in part and denies in part both motions.

## I.    Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] The substantive law defines which facts are material.[2] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[3] A fact

---

[1] Fed. R. Civ. P. 56(a).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] *Id.*

is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]  In considering a motion for summary judgment, a court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[6]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, a party opposing a properly supported motion for summary judgment may not rest upon the allegations or denials in its pleadings.[9]  Rather, the burden shifts to the non-moving party to "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To

---

[4] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248).

[5] *Id.*

[6] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

[7] *Adler*, 144 F.3d at 670–71.

[8] *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[9] *Id.*

[10] *Id.*

accomplish this, the facts must be supported by affidavits, deposition transcripts, or specific exhibits incorporated therein.[11]  The court's function at this juncture is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the non-moving party for a finder of fact to return a verdict in that party's favor.[12]

## II.   Whether Z[3] Properly Controverted the Facts Relied Upon by Digital in its Second Motion for Partial Summary Judgment

Digital contends Z[3] improperly responded to approximately forty-eight (48) paragraphs contained in Plaintiff's Statement of Uncontroverted Facts in Support of Plaintiff's Second Motion for Partial Summary Judgment ("SOF"), ECF No. 161.  Digital argues that the Court must deem these facts admitted under this District's local rules.

D. Kan. R. 56.1 governs motions for summary judgment in this District.  It provides, in relevant part, that the facts relied upon by a movant "must be numbered and must refer with particularity to those portions of the record upon which movant relies."  Further, "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[13]

Any "memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which" the non-moving party "contends a genuine issue exists."[14]  Each fact in dispute must refer with particularity to those

---

[11] *Id.*

[12] *BRB Contractors, Inc. v. Akkerman Equip., Inc.*, 935 F. Supp. 1156, 1159 (D. Kan. 1996).

[13] D. Kan. R. 56.1(a).

[14] D. Kan. R. 56.1(b).

portions of the record upon which the opposing party relies.[15]

If the responding party cannot truthfully admit or deny a fact, the response must specifically describe the reasons why.[16]  All responses must fairly meet the substance of the matter asserted.[17]

Z[3] "dispute[s]" approximately twenty-eight paragraphs of Digital's SOF by indicating that the material cited by Digital does not support the statements contained in those paragraphs.  Digital argues that Z[3] failed to comply with this District's local rules because it did not attempt to admit any portion of these paragraphs that are supported by admissible evidence.   In many instances, it appears that Digital cites to incorrect deposition pages or exhibits to support these facts.  For example, in paragraph 5, Digital states that Derek Douglas, Digital's Comptroller, was in charge of "getting the document in final form."  But the cited pages in support of this purported fact do not contain the quoted language.  And Digital makes numerous errors when citing to the deposition transcript of Stephen Phillips, Digital's Director of Engineering (SOF ¶¶ 26–42).[18]

As the moving party, Digital is required to support its factual assertions by citing to particular parts of materials in the record.[19]  The Court will deem these paragraphs admitted only to the extent that the material cited by Digital actually supports the asserted facts or the Court

---

[15] *Id.*

[16] D. Kan. R. 56.1(e).

[17] *Id.*

[18] The facts asserted by Digital might be supported somewhere in the deposition transcript of Phillips, but not at the specific pages cited by Digital in support of each fact.

[19] Fed. R. Civ. P. 56(c)(1)(A).

otherwise finds support for the facts in the record.[20]   The facts that the Court finds to be uncontroverted will appear in Section III below.

Digital also argues that $Z^3$ improperly disputes paragraphs 11 through 15.  These purported facts all relate to and/or allegedly cite language from Digital's Signature Authorities Policy.  Digital cites to Exhibit 16 in support of these facts.  But Exhibit 16 is not Digital's Signature Authorities Policy.  Exhibit 16 is a e-mail between Digital executives commenting on the proposed policy. Although Digital concedes it failed to attach a copy of its Signature Authorities Policy as Exhibit 16, it argues that $Z^3$ should have admitted or denied paragraphs 11 through 15 because $Z^3$ had a copy of the Signature Authorities Policy.   The Court does not believe $Z^3$ is obligated to correct Digital's mistake and look for evidence that supports Digital's "facts."   The Court will not deem these paragraphs as uncontroverted based solely upon $Z^3$'s failure to review its copy of Digital's Signature Authorities Policy.[21]

$Z^3$ admits paragraph 26 of Digital's SOF in which Digital states that it attached as Exhibit 15 a true and correct copy of its Amended and Restated Bylaws as of September 1, 2005.  In paragraphs 27 and 28, Digital quotes various provisions from its bylaws but fails to specifically cite to Exhibit 15.  $Z^3$ disputes these paragraphs because Digital cites to no evidence supporting the statements.  It is clear that Digital intended to cite to Exhibit 15.   Except for a minor typographical

---

[20] *See Anderson v. United Parcel Serv.*, No. 09-2526-KHV, 2011 WL 4048795, at *1 n.1 (D. Kan. Sept. 13, 2011) (accepting as true defendant's factual statements *that were adequately supported by evidence in the record* when non-movant failed to controvert the facts as required by D. Kan. R. 56.1) (emphasis added); *D'Souza-Klamath v. Cloud Cnty. Health Ctr., Inc.*, No. 07-4031-KGS, 2009 WL 902377, at *2 (D. Kan. Mar. 31, 2009) (deeming defendant's statement of facts admitted *to the extent the facts find support in the record* when plaintiff failed to specifically controvert them) (emphasis added).

[21] On August 18, 2011, Digital filed a copy of its Signature Authorities Policy as a corrected Exhibit 16.  ECF No. 183.

error, the language quoted in paragraphs 27 and 28 of Digital's SOF accurately quotes Digital's bylaws.[22] In the Court's statement of uncontroverted facts, the Court has corrected the typographical error.

Paragraphs II-6 through 18[23] of Digital's SOF facts set forth various provisions of PLA-2009. In its opposition, "$Z^3$ denies that the statement[s] accurately characterize[ ] the text of the contract." For similar reasons, $Z^3$ disputes paragraphs 51 and 52, which refer to statements made in $Z^3$'s counterclaim. $Z^3$ directs the Court to its counterclaim for the true and correct language used. The Court agrees that $Z^3$ should have described how any of the cited language is inaccurate. As discussed above, the Court will deem these paragraphs admitted only to the extent the cited material actually supports Digital's asserted facts.

Digital also argues that $Z^3$ improperly disputes paragraphs II-60, 62, 63, and 64. These paragraphs contain excerpts from the deposition of Bruno Marchevsky[24] wherein Mr. Marchevsky testifies about his understanding of PLA-2009. In its opposition, $Z^3$ disputes these facts and denies that the statements accurately characterize the text of the contract but does not further elaborate how.

The Court has compared paragraphs II-60, 62, 63, and 64 to Mr. Marchevsky's deposition transcript. Paragraph II-60 states, "Marchevsky admits that all of the 'licensed materials' as that term is used in the preamble to Contract PLA-2009 are the materials listed in Exhibit 1 to the

---

[22] In paragraph 28 of its SOF, Digital mistakenly wrote "performance" instead of "perform."

[23] On page 12 of its SOF, Digital began re-numbering the paragraphs following paragraph 54, starting with number 6. So instead of a paragraph 55 on page 12, there is a new paragraph 6. As a result, there are two sets of paragraphs numbered 6 through 54. The Court refers to the second set of paragraphs as II-6, II-7, etc.

[24] $Z^3$ is composed of two members – Mr. Marchevsky and Aaron Caldwell.

contract." This accurately reflects Mr. Marchevsky's testimony. Accordingly, the Court deems this statement to be uncontroverted.

But Digital mischaracterizes Marchevsky's testimony in paragraphs 62, 63 and 64. For example, in paragraph 62, Digital states that Marchevsky "admits that there were conditions to the 'requirement' in Contract PLA-2009 that Digital purchased '12,000' DM365 modules from Z3 'per year for three years.'" Although Marchevsky testified that there were conditions in PLA-2009, he never specifically testified that there were conditions to the requirement that Digital purchase 12,000 DM365 modules. Digital also mischaracterizes Marchevsky's testimony in paragraphs 63 and 64. Accordingly, the Court will not deem paragraphs 62, 63 and 64 as uncontroverted.

Z³ contends it lacks sufficient information to admit or deny paragraph II-41 but does not describe the reasons why as required by D. Kan. R. 56.1(e). Paragraph II-41 states, "Digital has not used any of Z³'s designs for the DM365 in any fashion." Digital cites the deposition of Stephen Phillips at Exhibit 9, 117:25–118:2 to support this fact. The cited portion of Mr. Phillips' deposition states:

> 25.    product?
>
> 1.    Mr. Wilson, object to the form of the
>
> 2.    question.[25]

Because Digital's cited evidence does not support the assertion made in paragraph II-41, the Court will not deem this fact to be uncontroverted based solely upon Z³'s failure to comply with D. Kan. R. 56.1(e).

## III.    Uncontroverted Facts

---

[25] Phillips Dep. 117:25–118:2, ECF No. 162-9.

The following facts are uncontroverted:

Digital designs, manufactures, and distributes digital video systems for law enforcement agencies.[26]  For example, some of its existing or planned products have included an audio-visual recording system that an officer would wear on his person and digital video recorders for police cars.[27]  The functionality of some of Digital's existing or planned products requires digital media technology, such as the Texas Instruments ("TI") DM355 and DM365 silicon chips.[28]

$Z^3$'s principal business is to design and manufacture, to customer specifications, hardware modules for use in videographic products.[29]

Robert Haler was Digital's Executive Vice-President for Engineering and Production.[30]  In 2008, Haler telephoned Aaron Caldwell, President of $Z^3$, to discuss possible business dealings between Digital and $Z^3$.[31]  Haler approached Caldwell about $Z^3$ designing and manufacturing modules for Digital using the TI DM355 silicon chip, followed by the anticipated DM365 chip.[32]

The first modules would contain the TI DM355 chip, while the next set of modules would contain TI's next generation chip, the DM365, which was made available to $Z^3$ in December 2008.[33]

---

[26] Haler Dep. 20:1–21:5, ECF No. 155-33.

[27] *Id.*

[28] *Id.* 42:8–17.

[29] Caldwell Aff. ¶ 1, ECF No. 155-1.

[30] Haler Dep. 19:13–16, ECF No. 155-33.

[31] *Id.* 37:25–41:11; Caldwell Aff. ¶¶ 1–2, ECF No. 155-1.

[32] Caldwell Aff. ¶ 2, ECF No. 155-1.  Although Digital disputes this fact, Digital cites to no evidence that contradicts Caldwell's statement.  The Court finds that this fact to be undisputed.  Fed. R. Civ. P. 56(e)(2).

[33] Caldwell Aff. ¶ 2, ECF No. 155-1.

Digital planned to use the DM355 module for the first production run of Digital's FirstVu camera.[34] It was Haler's plan to then transition into the more versatile DM365 module.[35]

On November 1, 2008, Haler, on behalf of Digital, and Caldwell, on behalf of $Z^3$, signed a contract entitled Production License Agreement PLA-2008.10.31 ("PLA-2008") providing generally for the design of 1,000 DM355 modules and the licensing of the design and modules to Digital.[36] Haler had authority to execute PLA-2008 on behalf of Digital.[37]  Digital's President and Chief Executive Officer, Stan Ross, understood that Haler was going to be signing a contract with $Z^3$ for the DM355 work, learned that Haler had signed the contract shortly after it was signed, and totally trusted Haler.[38]

PLA-2008 required Digital, as the "Licensee," to pay $Z^3$, as the "Licensor," $155,000 in fees and per-unit prices for 1,000 DM355 modules.[39] Pursuant to these terms, Digital paid $Z^3$ $140,000 of the $155,000 fee.[40] $Z^3$ delivered the DM355 software on December 24, 2008.[41] $Z^3$ delivered the DM355  modules in two lots, 200 units on January 14, 2009 and 800 units on March 10, 2009.[42]

---

[34] Haler Dep. 41:6–11, ECF No. 161-8.

[35] *Id.* 42:8–21.

[36] PLA-2008, ECF No. 155-16.

[37] Heckman Dep. 31:19–32:21, ECF No. 155-34.

[38] Ross Dep. 27:19–29:10, ECF No. 155-35.

[39] PLA-2008, ECF No. 155-16.

[40] Pretrial Order ¶ 4.a.14, (stipulation no. 14), ECF No. 148.

[41] E-mail from Aaron Caldwell to Jeff Burgess (Dec. 24, 2008), ECF No. 155-17. Although Digital disputes this fact, it does not provide any evidence to the contrary.  The Court finds that this fact to be undisputed.  Fed. R. Civ. P. 56(e)(2).

[42] Caldwell Aff. ¶ 10, ECF No. 155-1.

10

Paragraph 3 of PLA-2008 is entitled "Warranties and Limitations."[43]

As to software and hardware design, Paragraph 3.A. states in relevant part:

> A.   WARRANTY FOR SOFTWARE PRODUCTS AND HARDWARE DESIGN:
>
> LICENSOR WARRANTS FOR THIRTY (30) DAYS AFTER PURCHASE THAT THE MEDIA (IF THE SOFTWARE IS PROVIDED ON MEDIA) WILL BE FREE FROM DEFECTS AND THAT THE SOFTWARE PROGRAMS WILL SUBSTANTIALLY CONFORM TO THE PRODUCT REQUIREMENTS SET FORTH IN THE ATTACHED LICENSE EXHIBIT 1.
>
> THE LICENSED MATERIALS ARE OTHERWISE PROVIDED "AS IS".   LICENSOR MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OR COMPLETENESS.[44]

As to hardware production, Paragraph 3.B. of PLA-2008 provides in relevant part:

> B.   WARRANTY FOR PRODUCTION HARDWARE MODULES
>
> LICENSOR WARRANTS FOR ONE HUNDRED EIGHTY (180) DAYS AFTER RECEIPT BY LICENSEE OF THE LICENSED MATERIALS HARDWARE THAT THE LICENSED MATERIALS HARDWARE SHALL BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP, AND WILL PERFORM SUBSTANTIALLY IN ACCORDANCE WITH THE SPECIFICATIONS AND RELATED DOCUMENTATION PROVIDED TO LICENSEE.
> . . . .
>
> THE LICENSOR WILL PROVIDE LICENSEE UP TO 3% REPLACEMENT FOR PRODUCT RETURNED DURING WARRANTY DUE TO HARDWARE DEFECT IN LICENSED MATERIALS OR DUE TO MANUFACTURING PROCESS

---

[43] PLA-2008 ¶ 3, ECF No. 155-16.

[44] *Id.* ¶ 3.A.

PROVIDED BY LICENSOR. LICENSOR WILL HAVE THE RIGHT TO REQUEST RETURNED WARRANTY PRODUCT FOR INSPECTION. LICENSOR WILL BE RESPONSIBLE FOR SHIPPING COSTS ASSOCIATED WITH RETURNS.

IN THE ADVENT OF CATASTROPHIC FAILURE, DEFINED AS A FAILURE RATE OF GREATER THAN 10% DUE TO HARDWARE DEFECT(S) IN LICENSED MATERIALS OR DUE TO LICENSOR'S MANUFACTURING PROCESS, LICENSOR SHALL ASSIST IN DETERMINATION OF THE ROOT CAUSE OF THE FAILURE AND SHALL REPAIR OR REPLACE THE DEFECTIVE MATERIALS AT LICENSOR'S OPTION AND EXPENSE. ANY SUCH REPAIR OR REPLACEMENT SHALL BE COMPLETED IN A TIMELY FASHION AS IS PRACTICAL . . . LICENSOR WILL HAVE THE RIGHT TO REQUEST RETURNED WARRANTY PRODUCT FOR INSPECTION. LICENSOR WILL BE RESPONSIBLE FOR SHIPPING COSTS ASSOCIATED WITH RETURNS.

THE LICENSED MATERIALS ARE OTHERWISE PROVIDED "AS IS". LICENSOR MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OR COMPLETENESS.[45]

Paragraph 3 of PLA-2008 also states in relevant part:

IN NO EVENT SHALL LICENSOR, OR ANY APPLICABLE LICENSOR, BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES, HOWEVER CAUSED, ON ANY THEORY OF LIABILITY AND WHETHER OR NOT LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING IN ANY WAY OUT OF THIS AGREEMENT, THE LICENSED MATERIALS OR LICENSEE'S USE OF THOSE MATERIALS. EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, COST OF REMOVAL OR REINSTALLATION, COMPUTER TIME, LABOR COSTS, LOSS OF GOODWILL, LOSS OF PROFITS, LOSS OF SAVINGS, OR LOSS OF USE OR INTERRUPTION OF BUSINESS.

---

[45] *Id.* ¶ 3.B.

12

IN NO EVENT WILL LICENSOR'S AGGREGATE LIABILITY UNDER THIS AGREEMENT OR ARISING OUT OF LICENSEE'S USE OF THE LICENSED MATERIALS EXCEED THE FEES PAID TO LICENSOR BY LICENSEE FOR THE LICENSED MATERIALS OR FIVE HUNDRED DOLLARS (U.S.$500), WHICHEVER IS GREATER.[46]

Doug Fletcher at Digital spoke with Z[3]'s President Aaron Caldwell about issues with "pink noise" in the DM355 module probably in the April 2009 time frame, but was not sure when.[47]   Until Digital filed and served its Complaint upon Z[3], Digital never informed Z[3] that Digital believed the "pink noise" constituted grounds for repairing or replacing the modules.[48]  Digital never asked Z[3] to repair or replace the modules with regard to the pink noise issue or any other alleged issues that Digital raises in this lawsuit.[49]

Digital's bylaws in effect at least from October 1, 2008 through April 30, 2009 contained the following provisions:

ARTICLE IV

OFFICERS

. . . .

9.    Vice President.

Each vice president shall have such powers and perform such duties as the Chairman of the Board, the Chief Executive Officer, the President or the Board of Directors may from time to time prescribe and shall perform such other duties as may be prescribed in these Bylaws. . . .

---

[46] *Id.* ¶ 3.A.

[47] Fletcher Dep. 13:10–17:20, ECF No. 172-19.

[48] Caldwell Aff. ¶¶ 6, 13, ECF No. 155-1.

[49] *Id.* ¶ 13.

13

. . . .

## ARTICLE VI

## MISCELLANEOUS

1.      Execution of Contracts.

> Except as otherwise required by law or by these Bylaws, any
> contract or other instrument may be executed and delivered
> in the name of the Corporation and on its behalf by the
> Chairman of the Board, the Chief Executive Officer, the
> Chief Financial Officer, the Treasurer, the President, or any
> Vice President.  In addition, the Board of Directors may
> authorize any other officer [or] officers or agent or agents to
> execute and deliver any contract or other instrument in the
> name of the Corporation and on its behalf, and such authority
> may be general or confined to specific instances as the Board
> of Directors may by resolution determine.[50]

In the summer of 2008, Digital and its Sarbanes-Oxley compliance auditors began developing a two signature policy.[51]   Jaime Kilcoyne, Digital's Sarbanex-Oxley "expert" had suggested to Thomas Heckman (Digital's Chief Financial Officer)  and/or Derek Douglas that Digital needed "to consider and adopt something of that sort because . . . it would be a weakness if" Digital did not have a two signature policy in the "[Sarbanes-Oxley] reporting."[52]

At an October 2008 meeting, Heckman told the Board of Directors that "we were implementing a two signature policy."[53]   Digital's Board of Directors was "fully in favor of it."[54]

---

[50] Am. & Restated Bylaws of Digital Ally, Inc., ECF No. 155-30.

[51] Heckman Dep. 37:7–38:6, ECF No. 162-13.

[52] *Id.*

[53] *Id.* 39:22–40:24.

[54] *Id.*

The Signature Authorities Policy was still being drafted in early December 2008.[55]  Digital's Signature Authorities Policy was to become "effective immediately once all of the officers have signed and dated [a December 10, 2008] memo."[56]  Stan Ross admits that his signature appears on the transmittal memorandum.[57]  Ross recognizes Robert Haler's signature and has identified it as one of the signatures that appears on the transmittal memorandum.[58]  Haler's signature is dated December 22, 2008.[59]

On January 9, 2009, Aaron Caldwell on behalf of Z[3] and Robert Haler signed Software/Hardware Design and Production License Agreement PLA-2009.01.02 ("PLA-2009").[60] At the time Haler executed PLA-2009, he was Digital's Executive Vice President for Engineering and Production.[61]  No other officer from Digital signed PLA-2009.[62]

---

[55] E-mail from Tom Heckman to Stan Ross, Robert Haler, and Ken McCoy (Dec. 10, 2008), ECF No. 172-16.

[56] Memo from Derek Douglas to Stan Ross, Bob Haler, Ken McCoy, and Tom Heckman (Dec. 10, 2008), ECF No. 178-1 (Ex. 42).

[57] Ross Dep. 33:11-17, ECF No. 161-12.

[58] Id. 33:11–24.

[59] Memo from Derek Douglas to Stan Ross, Bob Haler, Ken McCoy, and Tom Heckman (Dec. 10, 2008), ECF No. 178-1 (Ex. 42).

[60] Pretrial Order ¶ 4.a.5 (stipulation no. 5), ECF No. 148; Software/Hardware Design and Production License Agreement PLA-2009.01.02, ECF No. 155-19.

[61] Ross Dep. 83:22–24, ECF No. 155-35; Haler Dep. 19:13–16, ECF No. 155-33; PLA-2009, ECF No. 155-19.

[62] PLA-2009, ECF No. 155-19.

Thomas Heckman talked to Robert Haler about PLA-2009 before Haler signed the contract.[63] Stan Ross knew before Haler signed PLA-2009 that Haler was going to engage $Z^3$ regarding DM365 technology.[64]  Ross never told Haler not to engage $Z^3$ and never told Haler not to sign a contract with $Z^3$.[65]

The objective of PLA-2009 was for $Z^3$ to design a custom version of the DM365 module and the software that would go into all or many Digital products.[66]

The preamble to PLA-2009 states, in part, "By installing, copying or otherwise using the Licensed Materials, LICENSEE agrees to abide by the following provisions."[67]  Marchevsky testified that all of the licensed materials as that term is used in the preamble to PLA-2009 are the materials listed in Exhibit 1 to the contract.[68]  Marchevsky admits that the "licensed materials" to which the preamble to PLA-2009 refers consist of hardware in the form of the DM365 modules to be constructed by $Z^3$ and software consisting of the computer programs designed to make that hardware perform whatever functions it was supposed to perform.[69]

Paragraph 1 of Exhibit 1 to PLA-2009 entitled "Deliverable Items" states:

---

[63] Heckman Dep. 57:19–25, ECF No. 155-34.  Although Digital disputes this fact, it does not provide any evidence to the contrary.  The Court finds that this fact to be undisputed.  Fed. R. Civ. P. 56(e)(2).

[64] Ross Dep. 43:17–44:8, ECF No. 155-35.

[65] *Id.* 48:7–8 and 49:3–6.

[66] Marchevsky Dep. 78:1–9, ECF No. 162-10.

[67] PLA-2009 ¶ 1, ECF No. 155-19.

[68] Marchevsky Dep. 138:5–22, ECF No. 162-10.

[69] *Id.* 78:10–19.

1)      Deliverable items:

    a)      Includes the following licensed hardware:

| Product Number | Description |
| --- | --- |
| Z3-DM365-MOD-OX-SP2 | DM365 special hardware module board |
| Z3-DM365-APP-OX-SP2 | DM365 special hardware application board |

    b)      Includes the following licensed software for Texas Instruments DM365:

| Product Number | Description |
| --- | --- |
| Z3-DM365-MOD-SW-2.6.22 | 2.6.22 Linux Software for DM365 including drivers and features below |
| Z3-DM365-MOD-SW-COD | A/V Encoder/Decoder Software application for DM365[70] |

Paragraph 2 of Exhibit 1 to PLA-2009 states, in part, that a "Special version of Z3-DM365-MOD will be designed and manufactured," and that "Licensee will have final approval of design."[71]

Paragraph 13 of Exhibit 1 to PLA-2009 requires Digital to pay $Z^3$ $300,000 in fees.[72]  In accordance with the terms of PLA-2009, Digital made two payments on PLA-2009: one in the amount of $75,000 on January 2, 2009 and one in the amount of $50,000 on February 6, 2009.[73]

Paragraph 14 of Exhibit 1 to PLA-2009 is entitled "Guaranteed Minimum Purchase Quantity or Minimum Royalty."[74]  Paragraph 14(a) of Exhibit 1 to PLA-2009 called for Digital to order 50

---

[70] PLA-2009, Ex. 1 ¶ 1, ECF No. 155-19.

[71] *Id.* Ex. 1 ¶ 2.

[72] *Id.* Ex. 1 ¶ 13.

[73] Pretrial Order ¶ 4.a.6 (stipulation no. 6), ECF No. 148.

[74] PLA-2009, Ex. 1 ¶ 14, ECF No. 155-19.

pre-production sample units at $200 per unit.[75]  Paragraph 14(b) of Exhibit 1 to PLA-2009 called

for Digital to order 3,000 units during the first fiscal year of the contract at $100 per unit.[76]

Paragraph 14(b)(iii)(1) of Exhibit 1 to PLA-2009 has a conditional minimum order term of

12,000 units per year for a three year period; it states:

iii)    Minimum 12,000 units or equivalent Royalty PER YEAR for 3 years.

(1) LICENSEE will provide LICENSOR 1st opportunity to manufacture modules given LICENSOR'S per module pricing, quality, and delivery are competitive with alternative manufacturers, including consideration of royalty cost for non-Z3 manufactured modules.[77]

Paragraph 14(b)(iv) of Exhibit 1 to PLA-2009 states, in part:

If LICENSOR cannot provide on-time delivery, a price and quality acceptable to LICENSEE, or is not willing to produce Z3-DM365-MOD-OX-SP2, then LICENSEE has the right to use alternative manufacturing.  LICENSEE is liable for royalty of $7.50 per unit on modules actually sold by LICENSEE on all modules not manufactured by Z3.  If LICENEE [sic] does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to 12,000*7.500 = $90,000 royalty per calendar year or the pro-rated balance if at least some units have been purchased within the fiscal year in question. . . .[78]

PLA-2009 contemplates a design period, including interim payments to Z[3], followed by a

manufacturing and delivery period when Z[3] would deliver modules and software after receiving

orders from Digital.[79]  Paragraph 12 to Exhibit 1 of PLA-2009 sets forth a design schedule,

---

[75] *Id.* Ex. 1 ¶ 14(a).

[76] *Id.* Ex. 1 ¶ 14(b).

[77] *Id.* Ex. 1 ¶ 14(b)(iii)(1).

[78] *Id.* Ex. 1 ¶ 14(b)(iv).

[79] *Id.* Ex. 1 ¶¶ 12–13.

18

commencing in "Week 0" when Digital was to provide "all necessary design details" to $Z^3$, and ending once Digital received and tested sample units.[80]  Under the contract, this design period would take 28 weeks.[81]  The design schedule does not require $Z^3$ to deliver an initial sample until "Week 10" of the contract.[82]

During the "design period," Digital was obligated to pay $300,000 in fees according to the schedule set forth in paragraph 13 to Exhibit 1 to PLA-2009, with the last payment being made in Week 28, when pre-production samples were available.[83]

From January through early April 2009, engineers from Digital worked extensively with $Z^3$ engineers, by e-mail and phone, on the DM365 module.[84]  Digital was still providing design details to $Z^3$ in March 2009.[85]  $Z^3$ completed the design work on the DM365 module sometime in March 2009.[86]  On March 23, 2009, $Z^3$ provided the design schematics to Digital.[87]

Aaron Caldwell believed that Robert Haler had authority to enter into PLA-2009 on behalf of Digital based upon Haler's position as an Executive Vice-President and because Haler had

---

[80] *Id.* Ex. 1 ¶ 12.

[81] *Id.*

[82] *Id.*

[83] *Id.* Ex. 1 ¶ 13.

[84] Caldwell Aff. ¶ 9 & App. 2, ECF Nos. 155-1 & 155-2.

[85] Caldwell Aff., App. 2, ECF No. 155-2.

[86] Caldwell Dep. 66:21–24, ECF No. 186-1.

[87] E-mail from Bob Faskos to Jeff Burgess and Robert Haler (Mar. 23, 2009) (DIGITAL 000461), ECF No. 155-2; *see also* Marchevsky Dep. 31:16–24 (confirming that the design schematics were provided to Digital), ECF No. 186-1.

executed PLA-2008 on Digital's behalf.[88]  The form and structure of PLA-2008 and PLA-2009 are similar.[89]

Between December 2008 and January 2009, Digital kept its Signature Authorities Policy on its "intranet."[90]  $Z^3$ was not aware that Digital had an "intranet" and no one from $Z^3$ accessed Digital's "intranet."[91]  Neither Haler nor anyone else at Digital ever informed $Z^3$ of Digital's Signature Authorities Policy.[92]  Neither Caldwell nor anyone else at $Z^3$ knew about Digital's purported Signature Authorities Policy or any other policy related to Haler's authority to enter into contracts on behalf of Digital.[93]

On March 31, 2009, Digital relieved Robert Haler of certain duties as Executive Vice-President of Engineering and Production and hired Stephen Phillips to replace him.[94]  Haler officially resigned from Digital on April 23, 2009.[95]  Shortly thereafter, Phillips gave a presentation to the Board of Directors describing the Engineering Department as being in "chaos."[96]

---

[88] Caldwell Aff. ¶ 18, ECF No. 155-1.

[89] PLA-2008, ECF No. 155-16; PLA-2009, ECF No. 155-19; Haler Dep. 105:25–106:19, ECF No. 155-33.

[90] Heckman Dep. 38:19–39:21, ECF No. 162-13.

[91] Caldwell Reply Aff. ¶ 6, ECF No. 186-1 (Ex. 51).

[92] Caldwell Aff. ¶ 18, ECF No. 155-1; Ross Dep. 69:24–70:4, ECF No. 155-35; Haler Dep. 126:12–127:21, 133:10–25, ECF No. 155-33.

[93] Caldwell Aff. ¶ 18, ECF No. 155-1.

[94] Haler Dep. 32:18–34:11, ECF No. 155-33; Pretrial Order ¶ 4.a.15 (stipulation no. 15), ECF No. 148.

[95] Haler Dep. 28:16–18, ECF No. 155-33.

[96] Presentation, ECF No. 155-29.

Paragraph 3 of PLA-2009 states:

> Termination – This license is effective until terminated.  Without prejudice to any other rights, either party may terminate the other party's rights or obligations under this Agreement at any time with 30 days written notice . . . if the party receiving notice has breached a material term of this Agreement and fails to cure such breach within 30 days after receipt of written notice.[97]

On April 10, 2009, Digital, by its Chief Financial Officer, Thomas Heckman, sent a letter to Z³ purporting to terminate PLA-2009 under Paragraph 3, effectively immediately.[98]  The letter stated:

> In accordance with Paragraph 3 of the Software/Hardware Design and Production License Agreement PLA-2009.01.02 (the "Agreement") dated January 2, 2009 we are hereby notifying you that we are exercising our right to terminate the Agreement effective immediately.  Therefore please cease all activity with respect to this activity.[99]

After receiving the April 10 letter, Aaron Caldwell met with, had phone conversations with and exchanged e-mails with Stan Ross, Thomas Heckman, and Steve Phillips.[100]  Digital reaffirmed that it was standing by its termination letter and its direction that Z³ cease work on PLA-2009.[101]

---

[97] PLA-2009 ¶ 3, ECF No. 155-19.

[98] Letter from Thomas Heckman to Aaron Caldwell (Apr. 10, 2009), ECF No. 155-25.

[99] *Id*.

[100] Caldwell Aff. ¶ 17, ECF No. 155-1.

[101] *Id*.  This fact appears as Z³'s undisputed paragraph 68.  Z³'s statement of uncontroverted facts contains 92 paragraphs.  In its opposition, Digital responds to only 91 paragraphs.  Thus, Digital appears to have erroneously skipped or failed to respond to one of Z³'s paragraphs.  The Court has reviewed Digital's responses and believes that Digital's response identified in its paragraph 68 is actually a response to Z³'s paragraph 69.  As a result, it does not appear that Digital ever addresses the facts asserted in Z³'s paragraph 68.  The Court treats paragraph 68 as undisputed for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2).

If Z[3] had done any further work on PLA-2009, it was Digital's and Heckman's intent not to pay Z[3] for that work.[102]  Digital's April 10, 2009 letter caused Z[3] to stop working on the DM365 module.[103]

Digital did not give 30 days' written notice of the termination.[104]  Digital never notified Z[3] of any purported breach by Z[3] of PLA-2009 in Digital's April 10th letter or otherwise.[105]  Digital did not give Z[3] thirty days to cure any purported breach of PLA-2009.[106]

Digital never paid Z[3] $175,000 of the $300,000 identified in Paragraph 13 of Exhibit 1 to PLA-2009.[107]

Digital never ordered 50 pre-production samples of the DM365 module at $200 per unit as called for in Paragraph 14(a) of Exhibit 1 to PLA-2009.[108]  Digital never ordered 3,000 production units of the DM365 module at $100 per unit in the first fiscal year as called for in Paragraph 14(b)(ii) of Exhibit 1 to PLA-2009.[109]

---

[102] Heckman Dep. 117:8–18, ECF No. 155-34.

[103] Caldwell Aff. ¶ 17, ECF No. 155-1.

[104] *Id*. ¶ 16; Letter from Thomas Heckman to Aaron Caldwell (Apr. 10, 2009), ECF No. 155-25.

[105] Caldwell Aff. ¶ 16, ECF No. 155-1.  Although Digital denies this fact, Digital cites to no evidence contradicting it.  Rather, Digital merely states Z[3] was "well aware of its own breaches."  ECF No. 171.  Because Digital has not provided any evidence to the contrary, the Court finds that this fact to be undisputed.  Fed. R. Civ. P. 56(e)(2).

[106] Caldwell Aff. ¶ 16, ECF No. 155-1.

[107] *Id.* ¶ 19; *see also* Pretrial Order ¶ 4.a.6–7 (stipulation nos. 6 & 7), ECF No. 148.

[108] Caldwell Aff. ¶ 19; *see also* Pretrial Order ¶ 4.a.9 (stipulation no. 9), ECF No. 148.

[109] Caldwell Aff. ¶¶ 19–20; *see also* Pretrial Order ¶ 4.a.9 (stipulation no. 9), ECF No. 148.

Digital never ordered 12,000 additional production units of the DM365 module per year for three years at the target price of $100 per unit or pay an equivalent royalty of $270,000.[110]

$Z^3$ never produced any DM365 hardware and no DM365 hardware was ever given to Digital.[111]   $Z^3$ never provided a DM365 module to Digital, never provided a DM365 special hardware application board to Digital, never provided 2.6.22 Linux software for DM365, including drivers and features, to Digital, and never provided a A/V encoder/decoder software application for DM365 to Digital.[112]

 $Z^{3}$'s Marchevsky admits that he has no proof that Digital is buying DM365 modules, constructed according to $Z^3$'s designs, from someone other than $Z^3$ or that Digital has purchased any modules having the same function as the Z3-designed DM365 module from someone other than $Z^3$ or that Digital has purchased any DM365 boards of identical design or similar design from someone other than $Z^3$ or that Digital has purchased any boards or modules having the same configuration or function as the Z3-designed DM365 module from anyone other than $Z^3$.[113]

## IV.    Analysis

A.    PLA-2009 is a Valid Contract Between Digital and $Z^3$.

Digital contends that Robert Haler's signature did not bind Digital on PLA-2009 because Haler exceeded his authority under Digital's Signature Authorities Policy.   The Signature Authorities Policy allegedly required that PLA-2009 also be signed by Stan Ross, Digital's President

---

[110] Caldwell Aff. ¶¶ 19–20; Pretrial Order ¶ 4.a.9–10 (stipulation nos. 9 & 10), ECF No. 148.

[111] Marchevsky Dep. 79:13–23, ECF No. 162-10.

[112] *Id*. 143:8–122.

[113] *Id*. 74:7–75:23.

and Chief Executive Officer.  Because Ross did not also sign PLA-2009, Digital contends PLA-2009 is not a valid contract between it and $Z^3$.  Digital seeks summary judgment in its favor that Haler did not have authority to bind Digital on PLA-2009.  Digital also argues that $Z^3$ cannot prove Haler had apparent authority or that Digital ratified PLA-2009.

$Z^3$ contends that (1) Haler had actual authority to sign PLA-2009 under Digital's bylaws, regardless of Digital's purported Signature Authorities Policy; (2) Haler had apparent authority to sign PLA-2009 on behalf of Digital; (3) Digital ratified PLA-2009 by paying money and working on the contract for more than three months after Haler signed it; and (4) the Signature Authorities Policy on its face does not apply to production license agreements.  $Z^3$ moves for summary judgment in its favor on each of the above arguments.

      1.    <u>There is a dispute of fact whether Digital's Board of Directors adopted the Signature Authorities Policy.</u>

The parties dispute whether Haler had actual authority to execute PLA-2009 on behalf of Digital.  As presented by the parties, the issue turns on whether Digital's Signature Authorities Policy was adopted by Digital's Board of Directors (the "Board") or by the independent acts of Digital's officers.  For the reasons stated below, the Court concludes there are disputed issues of fact that prevent the Court from granting summary judgment for either party on this issue.

Because Digital is incorporated under the laws of Nevada, the Court will analyze the authority and duties of Digital's officers under Nevada law.[114]  Under Nevada law, "[a]ll officers . . . have such powers and duties as may be prescribed by the bylaws or determined by the board of

---

[114] *Jamison v. Pack*, 1992 WL 406527 at *3 n.1 (D. Kan. Dec. 11, 1992) (analyzing the authority and duties of the officers of a corporate party under Oklahoma law because party was incorporated in Oklahoma).

directors. . . ."[115]  In other words, an officer of a private corporation has only the authority delegated to him by the bylaws and/or the board of directors.[116]

Article IV, paragraph 9 of Digital's bylaws in effect at all times relevant states, "Except as otherwise required by law or by these Bylaws, any contract or other instrument may be executed and delivered in the name of the Corporation and on its behalf by . . . any Vice President."[117]  When he executed PLA-2009, Haler was Digital's Executive Vice President of Engineering and Production and an officer of Digital.[118]  As a result, Z[3] argues that Haler had actual authority under Digital's bylaws to execute PLA-2009.

Digital asserts that its Board adopted a Signature Authorities Policy that limited the authority previously given under its bylaws to officers to execute contracts.   This policy allegedly required that all contracts, including PLA-2009,  be executed by two officers.  Digital argues it is not bound under PLA-2009 because Haler did not have authority to execute PLA-2009 on his own.

In support of its position, Digital cites to the deposition testimony of Thomas Heckman, Digital's Chief Financial Officer.  Mr. Heckman testified that Digital's Sarbanes-Oxley "compliance auditors" suggested to him or Derek Douglas, Digital's comptroller, that Digital consider and adopt a two signature policy.[119]  Mr. Heckman stated that he talked to Digital's Board about the policy at

---

[115] Nev. Rev. Stat. § 78.130(3).

[116] *Berman v. Riverside Casino Corp.*, 247 F. Supp. 243, 245 (D. Nev. 1964).

[117] Am. & Restated Bylaws of Digital Ally, Inc., ECF No. 155-30.

[118] Pretrial Order ¶ 4.a. (stipulation no. 4), ECF No. 148.

[119] Heckman Dep. 38:1–6, ECF No. 172-13.

25

an October 2008 meeting, and that the Board was "fully in favor of it."[120]   In its Reply, Digital

asserts a "supplemental" declaration from Heckman in which he states that Digital's Board

"approved the adoption" of the two signature policy at the October 2008 meeting.[121]

Z[3] does not challenge that Digital's Board could restrict the authority of an officer to enter

into contracts.  Rather, Z[3] contends that the Signature Authorities Policy was created and adopted

by Digital's officers, not its Board.  Z[3] points out that Digital cites to no Board resolutions, no Board

meeting minutes reflecting a vote, or any other documentation from the Board showing it formally

adopted the policy.  This belies the notion that Digital's Board took formal action with regard to the

Signature Authorities Policy.  And a December 10, 2008 memorandum states, "This policy will be

effective immediately once all of the *officers* have signed and dated this memo."[122]   Z[3] also points

out that the Board of Directors could not have approved and adopted the actual Signature Authorities

Policy at issue because it was still being drafted in early December 2008 – after the October 2008

board meeting.[123]

For purposes of Digital's motion, the Court finds that Z[3] has presented sufficient evidence

to create a dispute of fact whether Digital's Board adopted the Signature Authorities Policy.[124]

---

[120] *Id*. 39:22–40:24.

[121] Supp. Decl. of Thomas Heckman ("Heckman Supp. Decl.") ¶ 5, ECF No. 188-1.

[122] Memo from Derek Douglas to Stan Ross, Bob Haler, Ken McCoy and Tom Heckman (Dec. 10, 2008) (emphasis added), ECF No. 178-1 (Ex. 42).

[123] E-mail from Tom Heckman to Stan Ross, Robert Haler, and Ken McCoy (Dec. 10, 2008), ECF No. 172-16.

[124] Further, Digital did not establish that the Signature Authorities Policy was in effect at the time PLA-2009 was executed by Haler.  Digital presented evidence authenticating the signatures of Ross and Haler that appear on the December 10, 2008 transmittal memorandum, but there is no evidence establishing that McCoy's or Heckman's signatures are genuine.

Similarly, in analyzing Z's motion for summary judgment on this issue, the Court finds Digital has presented sufficient evidence to create a dispute of fact whether Digital's Board adopted the Signature Authorities Policy.  As result, the Court denies the parties' respective motions for summary judgment on this issue.  But this does not end the Court's analysis regarding the validity of the contract.

> 2.    Haler had apparent authority to execute PLA-2009 on behalf of Digital.

Both parties move for summary judgment on whether Haler had apparent authority to execute PLA-2009 on behalf of Digital.  The parties analyze the issue of apparent authority under Nevada law.  Because there is nothing before the Court suggesting that there is a conflict between Nevada and Nebraska law on this issue, the Court will apply Nevada law as the parties have done.[125]

Under Nevada law, "[a]pparent authority is 'that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence.'"[126] Once the principal cloaks the agent with the apparent authority to act, the principal is estopped from later denying the actions of the agent.[127]  Apparent authority is an application of the doctrine of equitable estoppel, of which

---

[125] *See StoreVisions, Inc. v. Omaha Tribe of Neb.*, 795 N.W.2d 271, 279 (Neb. 2011) (describing principles of apparent authority under Nebraska law and stating that "apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct").

[126] *Dixon v. Thatcher*, 742 P.2d 1029, 1031 (Nev. 1987) (quoting *Myers v. Jones*, 657 P.2d 1163, 1164 (Nev. 1983)).

[127] *Ellis v. Nelson*, 233 P.2d 1072, 1076 (Nev. 1951).

reasonable reliance is a necessary element.[128]  The "party who claims reliance must not have closed

his eyes to warnings or inconsistent circumstances."[129]

> It is indispensable to keep in mind here that, as against the principal, there can be reliance only upon what the principal himself has said or done, or at least said or done through some other and authorized agent. The acts of the agent in question can not be relied upon as alone enough to support an estoppel.  If his acts are relied upon there must also be evidence of the principal's knowledge and acquiescence in them.[130]

"Apparent authority, including a third-party's reasonable reliance on such authority is a question of

fact."[131]

In its motion, Digital argues there is no evidence that Digital or one of its authorized agents

"said" or "did" anything to suggest that Haler had authority to enter into PLA-2009 on behalf of

Digital.  But Z[3] does not rely upon statements or acts by Haler in executing PLA-2009 as the basis

for its apparent authority argument.   Rather, Z[3] argues that Digital's conduct surrounding the

execution of PLA-2008 establishes that Haler had apparent authority to execute PLA-2009.

On November 1, 2008, Robert Haler, on behalf of Digital, and Aaron Caldwell, President

of Z[3], signed PLA-2008, which provided generally for the design of 1,000 DM355 modules and the

licensing of the design and modules to Digital.[132]   The bylaws at least in effect from October 1, 2008

through April 30, 2009 stated that "[e]xcept as otherwise required by law or by these Bylaws, any

---

[128] *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 261 (Nev. 1997).

[129] *Id.* (internal quotations omitted).

[130] *Ellis*, 233 P.2d at 1076 (internal citations omitted).

[131] *Great Am. Ins. Co.*, 934 P.2d at 261.

[132] PLA-2008, ECF No. 155-16.

contract or other instrument may be executed and delivered in the name of the Corporation and on its behalf by . . . any Vice President."[133]  When he executed PLA-2008, Haler was Digital's Executive Vice President for Engineering and Production and an officer of Digital.[134]  It is undisputed that Haler had actual authority to execute PLA-2008 on behalf of Digital.[135]  Digital's President and Chief Executive Officer, Stan Ross, understood that Haler was going to be signing a contract with $Z^3$ for the DM355 work and learned about the contract shortly after it was signed.[136]

Approximately two months after he executed PLA-2008, Haler signed PLA-2009.[137]  At the time he executed PLA-2009, Haler was still Digital's Executive Vice President for Engineering and Production.[138] The form and structure of PLA-2008 is similar to the form and structure of PLA-2009.[139]  For example, both contracts covered the design and production of modules containing Texas Instrument chips, which were to be used in Digital's FirstVu camera.[140]  Digital planned to use the DM355 module for the first production run of Digital's FirstVu camera and then transition into the more versatile $Z^3$ DM365 module.[141]

---

[133] Am. & Restated Bylaws of Digital Ally, Inc., ECF No. 155-30.

[134] PLA-2008, ECF No. 155-16; PLA-2009, ECF No. 155-19; Haler Dep. 19:13–16, ECF No. 155-33.

[135] Heckman Dep. 31:19–32:21, ECF No. 155-34.

[136] Ross Dep. 27:19–29:10, ECF No. 155-35.

[137] PLA-2008, ECF No. 155-16; PLA-2009, ECF No. 155-19.

[138] PLA-2009, ECF No. 155-19; Haler Dep. 19:13–16, ECF No. 155-33.

[139] PLA-2008, ECF No. 155-16; PLA-2009, ECF No. 155-19; Haler Dep. 105:25–106:19, ECF No. 155-33.

[140] Haler Dep. 105:25–106:19, ECF No. 155-33.

[141] Haler Dep. 41:6–11, 42:8–21, ECF No. 161-8.

Aaron Caldwell, Z[3]'s President, believed Haler had authority on behalf of Digital to enter into PLA-2009 based upon Haler's position as an Executive Vice-President and because Haler executed PLA-2008 on Digital's behalf.[142]

The above facts establish Haler's apparent authority to enter into PLA-2009 on behalf of Digital.  First, "where a person is clothed with a title such as vice-president or secretary of a corporation he has apparent authority as the agent of the corporation to act."[143]  As discussed above, Haler was Digital's Executive Vice President for Engineering and Production.  Although not conclusive of the issue of apparent authority, the Court believes that this strongly suggests Haler had authority to enter into contacts such as PLA-2009, which called for the production of modules to be utilized in Digital's products.

Second, and more significantly, Haler had authority under Digital's bylaws, as adopted by its Board, to enter into contracts at least through December 22, 2008.[144]  Pursuant to that authority, Haler caused Digital to enter into a valid contract (PLA-2008) with Z[3] on November 1, 2008.  Courts in various jurisdictions, including Nevada, have recognized that parties' prior dealings with each other can form the basis of apparent authority.[145]

---

[142] Caldwell Aff. ¶ 18, ECF No. 155-1.

[143] *Porter v. Tempa Min. & Mill. Co.*, 93 P.2d 741, 744 (Nev. 1939).

[144] The Signature Authorities Policy purportedly became effective by Haler's signature on December 22, 2008.

[145] *See Harrah v. Home Furniture, Inc.*, 214 P.2d 1016, 1017–19 (Nev. 1950) (husband, who had credit account with furniture store, was liable for large purchases charged to account by his wife on the day the couple separated; husband had previously paid for two smaller purchases made by wife and store had no reason to know that wife no longer had authority to make purchases on husband's account); *Hall-Brooke Found., Inc. v. City of Norwalk*, 752 A.2d 523, 527 (Conn. App. Ct. 2000) (recognizing that apparent authority can be derived from a course of dealing and holding that hospital could reasonably assume that city social workers remained

Moreover, termination of actual authority does not, by itself, terminate the apparent authority held by an agent.[146] Apparent authority ends when it is no longer reasonable for the third party with whom an agent deals to believe that the agent continues to act with actual authority.[147] Often termed "lingering authority," the Restatement (Third) of Agency recognizes that "it is reasonable for third parties to assume that an agent's actual authority is a continuing or ongoing condition, unless and until a third party has notice of circumstances that make it unreasonable so to assume."[148] The Restatement (Third) of Agency provides the following illustration:

> P Corporation, in the recycling business, retains A as a purchasing agent to buy recyclable material on its behalf. A is authorized by P Corporation to buy on terms that commit P Corporation to pay for the material when it arrives at P Corporation's recycling facility. A has purchased recyclables many times from T, who is in the business of building demolition. P Corporation terminates A's actual authority. T has no notice of the termination. As to T, A continues for a reasonable period of time to possess apparent authority to purchase from T on terms comparable to those on which A has made prior purchases on P Corporation's behalf.[149]

Despite knowing that Robert Haler had entered into PLA-2008 with $Z^3$ and that Haler was planning an engagement with $Z^3$ for DM365 modules, Digital provides no proof that it expressly

_____

authorized, as in past, to refer clients for treatment when hospital had no knowledge of city's internal policy that discontinued referrals to hospital).

[146] Restatement (Third) of Agency § 3.11 (2006). The Nevada Supreme Court has relied upon the Restatement (Second) of Agency in various opinions. *See Easton Bus. Opportunities, Inc. v. Town Exec. Suites-Eastern Marketplace, LLC*, 230 P.3d 827, 834 (Nev. 2010); *White Cap Indus., Inc. v. Ruppert*, 67 P.3d 318 (Nev. 2003). The Court believes that the Nevada Supreme Court would similarly look to the Restatement (Third) of Agency.

[147] *Id*.

[148] *Id*. cmt. c.

[149] *Id*. illus. 1.

notified Z[3] of Digital's "Signature Authorities Policy."  On the contrary, neither Robert Haler nor anyone else at Digital ever informed Z[3] of any Signature Authorities.[150]  Neither Aaron Caldwell nor anyone else at Z[3] knew about Digital's purported Signature Authorities Policy or any other policy related to Haler's authority to enter into contracts on behalf of Digital.[151]

At least until the Signature Authorities Policy was purportedly enacted, Digital's bylaws authorized any Vice President to execute a contract on Digital's behalf.  Digital held out Haler as having authority to execute PLA-2008 as its Executive Vice President for Engineering and Production, and Haler had such authority to cause Digital to enter into PLA-2008 with Z[3].  Two months later, Haler executed PLA-2009, a contract similar in form and structure to PLA-2008.  At the time he executed PLA-2009, Haler was still Digital's Executive Vice President for Engineering and Production.  There are no circumstances suggesting Z[3] should question Haler's authority.  Based upon the above facts, it was reasonable for Z[3] to believe Haler had authority to enter into PLA-2009.

In its opposition, Digital does not directly address Z[3]'s argument regarding lingering authority or otherwise suggest it is an improper theory to establish apparent authority.  Rather, Digital attempts to create a question of fact regarding Z[3]'s awareness of the Signature Authorities Policy by asserting that "this and other Digital policies were available for viewing on Digital's 'intranet' and any person who had access to such 'intranet' could have read, reviewed and in the process become fully aware of Digital's 'Signature Authorities Policy.'"[152]

---

[150] Caldwell Aff. ¶ 18, ECF No. 155-1; Ross Dep. 69:24–70:4, ECF No. 155-35; Haler Dep. 126:12–127:21, 133:10–25, ECF No. 155-33.

[151] *Id.*

[152] Pl.'s Resp. to Def.'s Statement of Facts ¶ 29, ECF No. 171.

The evidence that Digital cites for this proposition is the testimony of Heckman, who confirmed that the Signature Authorities Policy was kept on the company's intranet.[153] But Digital provides no evidence that $Z^3$ had access to Digital's intranet or this policy. Indeed, $Z^3$ was not aware that Digital had an intranet and no one from $Z^3$ accessed Digital's intranet.[154] Digital provides no proof that it expressly notified $Z^3$ of Digital's "Signature Authorities Policy" or provide any other evidence suggesting $Z^3$ should have questioned Haler's authority to execute PLA-2009 on behalf of Digital.

The Court concludes $Z^3$ subjectively believed that Haler had authority to execute PLA-2009 on behalf of Digital and that this belief was objectively reasonable. As a result, $Z^3$ has established as a matter of law that Haler had apparent authority to execute PLA-2009 on behalf of Digital.[155]

Because the Court concludes Haler had apparent authority to enter into PLA-2009 on behalf of Digital, the Court finds it unnecessary to address whether the Signature Authorities Policy applied to PLA-2009 or whether Digital ratified PLA-2009.

B.    $Z^3$ is Entitled to Summary Judgment on Counts II and III of Digital's Complaint

The only remaining claims in Counts II and III of Digital's Complaint are for rescission of PLA-2009 because Haler lacked authority and for a declaratory judgment that PLA-2009 is void because Haler lacked authority. As indicated above, PLA-2009 is binding on Digital and is not void. Further, because Haler had authority to bind Digital, Digital cannot maintain a claim for rescission

---

[153] Heckman Dep. 38:19–39:21, ECF No. 162-13.

[154] Caldwell Reply Aff. ¶ 6, ECF No. 186-1 (Ex. 51).

[155] The party asserting the agency relationship has the burden of proving the relationship. *Hamm v. Arrowcreek Homeowners' Ass'n*, 183 P.3d 895, 902 (Nev. 2008).

based upon Haler's alleged lack of authority.  Accordingly, the Court grants summary judgment to Z[3] on Counts II and III of Digital's Complaint.

      C.    <u>Digital Breached PLA-2009.</u>

Z[3] moves for summary judgment on its claim that Digital breached PLA-2009.  Z[3] contends that Digital breached PLA-2009 by attempting to terminate the contract without giving Z[3] thirty-days written notice and a thirty-day period to cure any material breach.  Z[3] also argues that Digital's conduct amounted to an anticipatory breach of contract.  In its opposition, Digital contends that Z[3] cannot recover for breach of contract because Z[3] did not substantially perform its own obligations under PLA-2009.

A federal court sitting in diversity applies "the choice of law principles of the state in which it sits."[156]  Kansas case law recognizes the principle of freedom to contract and, under most circumstances, permits parties to choose the law applicable to their contract.[157]  Accordingly, where the parties to a contract have entered into an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement unless doing so would be contrary to Kansas public policy.[158]

PLA-2009 states: "This Agreement will be governed by and interpreted in accordance with the laws of the State of Nebraska, without reference to conflict of laws principles."  Both parties

---

[156] *Morrison Knudsen Corp. v. Group Improvement Techniques, Inc.*, 532 F.3d 1063, 1077 n.12 (10th Cir. 2008).

[157] *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 374 (Kan. 2002).

[158] *Id.* at 375; *Venture Commercial Mortgage, LLC v. FDIC*, No. 09-2285-KHV, 2010 WL 820711, at *5 (D. Kan. Mar. 5, 2010).

appear to agree that Nebraska law applies.  Neither party has argued there are public policy concerns that dictate a different result.  The Court will apply Nebraska law.[159]

Under Nebraska law, to recover for breach of contract, $Z^3$ must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate Digital's duty.[160]  A "breach" is the non-performance of a duty.[161]

Further, "[t]o successfully bring an action on a contract, a plaintiff must first establish that the plaintiff substantially performed the plaintiff's obligations under the contract."[162]  In other words, "a party who has failed or refused to perform the terms and conditions imposed upon him by a contract, or has not been ready, willing, and able to perform the same, cannot recover for a breach thereof by the other party."[163]

"To establish substantial performance under a contract, any deviations from the contract must be relatively minor and unimportant."[164]  Substantial performance is shown when the following circumstances are established by the evidence: (1) the party made an honest endeavor in good faith to perform its part of the contract, (2) the results of the endeavor are beneficial to the other party,

---

[159] *See Venture Commercial Mortgage*, 2010 WL 820711, at *5 (applying Arizona law because the loan agreement provided that it would be governed by Arizona law).

[160] *See Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000).

[161] *Id.*

[162] *VRT, Inc. v. Dutton-Lainson Co.*, 530 N.W.2d 619, 623 (Neb. 1995).

[163] *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 457 (Neb. 1987).

[164] *VRT, Inc.*, 530 N.W.2d at 623.

and (3) such benefits are retained by the other party.[165]  The following instruction has also been approved by the Nebraska Supreme Court:

> If you find from the evidence that the plaintiff has substantially performed its contract in this regard, you should find for the plaintiff on this issue. And in passing upon this issue you are instructed that, if you believe the plaintiff in good faith substantially performed the terms of its contract, but that there are some slight omissions, or defects which are not so essential as to defeat the object of the parties, but could be readily remedied, then the plaintiff can recover the contract price less the damages occasioned by the omission or defect. Such damages are what it would have cost the defendant to remove the defect or omission, and thus give to the defendant what his contract called for.[166]

Digital contends that its obligations under PLA-2009 were triggered only when it received the licensed materials.  Digital bases its argument on the preamble to PLA-2009, which states: "By installing, copying or otherwise using the Licensed Materials, LICENSEE agrees to abide by the following provisions."[167]  Because Z[3] never provided any DM365 modules to Digital, Digital argues Z[3] did not substantially perform under PLA-2009.

In relying on the text of the preamble, Digital ignores the performance terms of the contract. In its Order denying Digital's first motion for partial summary judgment, the Court summarized Z[3]'s initial performance obligations under PLA-2009 as follows:

> A substantial portion of Z[3]'s work under the contract was to design DM365 modules pursuant to design details provided by Digital. Until Digital "provide[d] all necessary design details, Z[3] could not design, manufacture and deliver the modules.  PLA-2009 sets forth a design schedule, commencing in "Week 0" when Digital was to

---

[165] *Id.*

[166] *Rickertsen v. Carskadon*, 108 N.W.2d 392, 395–96 (Neb. 1961) (internal quotations omitted).

[167] PLA-2009, ECF No. 155-19.

provide "all necessary design details" to $Z^3$, and ending once Digital ordered, received, and tested sample units.  Under the contract, this design period would take 28 weeks.  The design schedule did not require $Z^3$ to deliver an initial sample until "Week 10 " of the contract, which could not have occurred until mid-March at the earliest. [168]

Digital also had certain obligations during this "design" period.  For example, Paragraph 13 of Exhibit 1 to PLA-2009 required Digital to pay $Z^3$ $300,000 in fees according to the schedule set forth therein.[169]   Digital was required to pay $75,000 upon execution of the license agreement on January 2, 2009 and $50,000 in February 2009.[170]   In essence, PLA-2009 contemplates a design period, including interim payments to $Z^3$, followed by a manufacturing and delivery period when $Z^3$ would deliver modules and software after receiving orders from Digital.

In accordance with the terms of PLA-2009, Digital made two payments on PLA-2009: one in the amount of $75,000 on January 2, 2009 and one in the amount of $50,000 on February 6, 2009.[171]  Thus, Digital was obligated to perform – and did perform –  under PLA-2009 even though no modules or software had yet been delivered or were required to be delivered.  Accordingly, the Court rejects Digital's argument that it was not obligated under the contract until it received the licensed materials from $Z^3$.

Digital's argument also does not address $Z^3$'s claim that $Z^3$ was excused from delivering any DM365 modules or software because Digital repudiated PLA-2009 before any modules and software were required to be delivered.  Under Nebraska law, where a promisor bound under an executory

---

[168] Order, ECF No. 113 (this was based upon uncontroverted facts).

[169] PLA-2009, Ex. 1 ¶ 13, ECF No. 155-19.

[170] *Id.*

[171] Pretrial Order ¶ 4.a.6 (stipulation no. 6), ECF No. 148.

contract repudiates his obligation before the time for performance, the promisee has the option to treat the contract as ended so far as further performance is concerned and to maintain an action at once for damages.[172] "Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."[173] And where a party's repudiation contributes materially to the non-occurrence of a condition of one of his or her duties, the non-occurrence is excused.[174] Whether $Z^3$ substantially performed under PLA-2009 should be determined by the obligations that were due at the time Digital purportedly breached the contract – April 10, 2009.

As discussed above, PLA-2009 sets forth a design schedule, commencing in "Week 0" when Digital was to provide "all necessary design details" to $Z^3$. The design schedule does not require $Z^3$ to deliver an initial sample until "Week 10 " of the contract. $Z^3$ argues that "Week 0" of PLA-2009 commenced on March 21, 2009 when it received all of the design details from Digital. Using March 21, 2009 as "Week 0," $Z^3$ would not have been obligated to provide Digital with any DM365 sample modules until May 30, 2009 – well after Digital's purported breach.

---

[172] *See In re Estate of Weinberger*, 279 N.W.2d 849, 854 (Neb. 1979).

[173] *Anderson Excavating & Wrecking Co. v. Sanitary Improvement Dist. No. 177*, 654 N.W.2d 376, 382 (Neb. 2002); *Village Realty Co. v. Alltel Commc'ns, Inc*., No. A-03-129, 2004 WL 2158023, at *9 (Neb. Ct. App. Sept. 28, 2004) (holding that if defendant repudiated its duty to perform under the contract, plaintiff was discharged from its duty to perform).

[174] *Anderson Excavating & Wrecking Co.*, 654 N.W.2d at 382; *see also Brown v. Alron, Inc*., 388 N.W.2d 67, 70–71 (Neb. 1986) (concluding that plaintiff had substantially performed his obligations under the contract even though he did not fulfill the length of the contract because defendant had "substantially hindered and obstructed" plaintiff's obligations under the contract).

From January through early April 2009, engineers from Digital worked extensively with $Z^3$ engineers, by e-mail and phone, on the DM365 module.[175]  $Z^3$ attaches a series of e-mails between it and Digital reflecting these communications.[176]  The e-mails demonstrate that Digital was still providing design details to $Z^3$ in March 2009.  Caldwell confirms that $Z^3$ was still receiving design details from Digital through March 21, 2009.[177]  Thus,  $Z^3$ was not obligated to provide any DM365 modules at the time of Digital's breach because "Week 10" could not have occurred by April 10, 2009.

There is also undisputed evidence that $Z^3$ was working on completing its obligations under PLA-2009 at the time of Digital's purported breach.  Caldwell testified that $Z^3$ completed the design work on the DM365 module sometime in March 2009.[178]  On March 23, 2009, $Z^3$ provided the design schematics to Digital.[179]

During his deposition, Thomas Heckman claimed that $Z^3$ did not have the capability to produce the DM365 modules, but Digital provides no actual evidence supporting this statement.[180] Stan Ross stated during his deposition that $Z^3$ was "unable to deliver what they were supposed to

---

[175] Caldwell Aff. ¶ 9 & App. 2, ECF Nos. 155-1 & 155-2.

[176] Caldwell Aff., App. 2, ECF No. 155-2.

[177] Caldwell Reply Aff. ¶ 4, ECF No. 186-1 (Ex. 51).

[178] Caldwell Dep. 66:21–24, ECF No. 186-1.

[179] E-mail from Bob Faskos to Jeff Burgess and Robert Haler (Mar. 23, 2009) (DIGITAL 000461), ECF No. 155-2; *see also* Marchevsky Dep. 31:16–24 (confirming the design schematics were provided to Digital), ECF No. 186-1.

[180] Heckman Dep. 98:10–99:23, ECF No. 162-13.

when they were supposed to . . .”[181]   But Ross appears to have been speaking about his opinion of

$Z^3$’s performance under the earlier PLA-2008.   For example, Ross refers to the pink noise issue,

which was related to the DM355 module.  Ross does not point to any particular missed deliverable

under PLA-2009 or offer any specifics of how $Z^3$ failed to perform under PLA-2009.  The testimony

of Heckman and Ross is insufficient to create a dispute of fact whether $Z^3$ substantially performed

its obligations under PLA-2009.  In short, Digital provides no contrary evidence that $Z^3$ failed to

perform its obligations under PLA-2009 at the time of Digital’s purported breach.

The Court concludes $Z^3$ made an honest endeavor in good faith to perform its part of the

contract, the results of the endeavor were beneficial to Digital,[182] and Digital retained such benefits.

$Z^3$ was excused from providing any DM365 modules to Digital because, as will be discussed below,

Digital breached the agreement in April 2009 – before any DM365 modules were required to be

delivered.  Accordingly, $Z^3$ substantially performed its obligations under PLA-2009 at the time of

Digital’s breach.

$Z^3$ argues Digital breached the termination clause of PLA-2009 and/or anticipatorily

repudiated PLA-2009.  Nebraska courts have found that termination clauses, including unilateral

termination clauses, are valid and enforceable.[183]  The termination clause in PLA-2009 states:

> Termination – This license is effective until terminated.  Without
> prejudice to any other rights, either party may terminate the other
> party’s rights or obligations under this Agreement at any time with
> 30 days written notice . . . if the party receiving notice has breached

---

[181] Ross Dep. 64:23–66:5, ECF No. 162-12.

[182] Although Digital apparently decided not to use the design schematics, this does not
alter the Court’s analysis.

[183] *Johnson Lakes Dev., Inc. v. Cent. Neb. Pub. Power & Irrigation Dist.*, 568 N.W.2d
573, 583 (Neb. Ct. App. 1997).

a material term of this Agreement and fails to cure such breach within 30 days after receipt of written notice.[184]

On April 10, 2009, Digital, by its Chief Financial Officer, Thomas Heckman, sent a letter to Z[3] purporting to terminate PLA-2009 under this clause, effectively immediately.[185]  The letter stated:

> In accordance with Paragraph 3 of the Software/Hardware Design and Production License Agreement PLA-2009.01.02 (the "Agreement") dated January 2, 2009 we are hereby notifying you that we are exercising our right to terminate the Agreement effective immediately.  Therefore please cease all activity with respect to this activity.[186]

It is undisputed that Digital did not give 30 days' written notice of the termination,[187] that Digital never notified Z[3] of any purported breach by Z[3] of PLA-2009 in Digital's April 10th letter or otherwise,[188] and that Digital did not give Z[3] thirty days to cure any purported breach of PLA-2009.[189]  The Court concludes that Digital breached PLA-2009 when it attempted to terminate the contract in its April 10, 2009 letter without notifying Z[3] of any alleged breach and/or providing Z[3] with the opportunity to cure any alleged breach.

---

[184] PLA-2009, ECF No. 155-19.

[185] Letter from Thomas Heckman to Aaron Caldwell (Apr. 10, 2009), ECF No. 155-25.

[186] *Id.*

[187] *Id.*

[188] Caldwell Aff. ¶ 16, ECF No. 155-1.  Although Digital denies this fact, Digital cites to no evidence contradicting it.  Rather, Digital merely states Z[3] was "well aware of its own breaches."  ECF No. 171.  Because Digital has not provided any evidence to the contrary, the Court finds that this fact to be uncontroverted.  *See* Fed. R. Civ. P. 56(e)(2).

[189] Caldwell Aff. ¶ 16, ECF No. 155-1.

Z[3] also argues that Digital's April 10, 2009 letter constitutes an anticipatory repudiation. "The anticipatory breach of a contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evidencing an intention to refuse performance in the future."[190]   Anticipatory breach requires an unequivocal repudiation of the contract.[191]

> "In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform. Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation. . . . However, language that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation."[192]

Although the question of whether there has been a repudiation is normally a question of fact,[193] it may be appropriate for courts to resolve the issue on summary judgment if the facts are uncontroverted and the moving party is entitled to judgment as a matter of law.[194]

In *Anderson Excavating & Wrecking Co. v. Sanitary Improvement District No. 177*, Anderson sent a letter stating that it was facing additional expenses to complete the contract.[195] The

---

[190] *Sack Bros. v. Tri-Valley Coop., Inc.*, 616 N.W.2d 786, 795 (Neb. 2000).

[191] *Id.* at 796.

[192] *Anderson Excavating & Wrecking Co. v. Sanitary Improvement Dist. No. 177*, 654 N.W.2d 376, 382 (Neb. 2002) (quoting Restatement (Second) of Contracts § 250 cmt. b (1981)).

[193] *Sack Bros.*, 616 N.W.2d at 795.

[194] *See* Fed. R. Civ. P. 56(c); *see also Sack Bros.*, 616 N.W.2d at 795–96 (affirming summary judgment on issue of anticipatory repudiation because party's intention to refuse to perform on contracts was undisputed).

[195] *Anderson Excavating & Wrecking Co.*, 654 N.W.2d at 382.

42

letter then stated Anderson would perform if a change order was entered to provide for additional payment of $27,000.[196]   The letter also stated that if a change order could not be made, the two remaining options were to rebid the contract or have the dispute settled through legal action.[197]   The Nebraska Supreme Court concluded that a reasonable reading of the letter showed that Anderson would not perform the contract as originally agreed, and thus, it was not error for the district court to find the letter was a repudiation of the contract.[198]

The facts of this case present an even clearer case of repudiation than *Anderson*.  Digital's April 10, 2009 letter was unequivocal – Digital was attempting to terminate the contract and directed Z³ to cease working on PLA-2009.   After receiving Digital's April 10, 2009 letter, Caldwell met with, had phone conversations with, and exchanged e-mails with Stan Ross, Thomas Heckman, and Steve Phillips.[199]   During these conversations, Digital reaffirmed that it was standing by its termination letter and its direction to Z³ to cease work on PLA-2009.[200]  If Z³ had done any further work on PLA-2009, it was Digital's intent not to pay Z³ for that work.[201]   Based upon the above undisputed facts, the Court concludes Digital anticipatorily repudiated PLA-2009 through its April 10, 2009 letter.

     D.        Z³'s Alleged Damages

---

[196] *Id.*

[197] *Id.* at 382–83.

[198] *Id*. at 383.

[199] Caldwell Aff. ¶ 17, ECF No. 155-1.

[200] *Id.*

[201] Heckman Dep. 117:8–18, ECF No. 155-34.

Z[3] alleges it incurred multiple categories of damages as a result of Digital's breach of PLA-2009 and asks the Court to enter judgment against Digital for $4,046,810.50.  Z[3] alleges it is entitled to (1) lost profits from Digital's failure to place a conditional minimum order of 12,000 units per year for a three year period; (2) lost profits from Digital's failure to place an unconditional minimum order of 3,050 units; and (3) $175,000 in unpaid fees.

   1.  <u>Lost Profits on Conditional Minimum Order Term</u>

PLA-2009 has a conditional minimum order term of 12,000 units per year for a three year period.[202]  Both parties move for summary judgment on whether Z[3] is entitled to lost profits from Digital's failure to order 36,000 modules.  In its motion, Z[3] argues it has proven its lost profits as a matter of law.  In Digital's motion for summary judgment, Digital argues that Z[3] is not entitled to its lost profits because (1) there were unfilled conditions precedent to Digital's obligation to order the 36,000 units; and (2) Digital could discharge its obligation to order the 36,000 units by paying an equivalent royalty.

    a.  <u>The condition precedent to the purchase of 12,000 units per year for a three year period was excused by Digital's anticipatory repudiation.</u>

As mentioned above, PLA-2009 has a conditional minimum order term of 12,000 units per year for a three year period.  Section 14(b)(iii)(1) further explains this conditional order term:

   iii)  Minimum 12,000 units or equivalent Royalty PER YEAR for 3 years.

    (1) LICENSEE will provide LICENSOR 1st opportunity to manufacture modules given LICENSOR'S per module pricing, quality, and delivery are competitive with alternative

---

[202] PLA-2009, Ex. 1 ¶ 14(b)(iii)(1), ECF No. 155-19.

>manufacturers, including consideration of royalty cost for
>non-Z3 manufactured modules.[203]

In other words, Digital was obligated to conditionally order 36,000 units of the module manufactured by $Z^3$ pursuant to $Z^3$'s "1st opportunity to manufacture" provided $Z^3$'s pricing, quality, and delivery schedule were competitive.

"'A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'"[204]   A condition precedent is either a condition that must be performed before a contract becomes binding upon the parties to it or must be fulfilled before a duty arises to perform the obligations of an already existing contract.[205]   "A promise, on the other hand, occurs when one expresses an intention that some future performance will be rendered and gives assurance of its rendition to the promise."[206]   "In the event of non-fulfillment, the distinction between a promise and a condition becomes important."[207]   As a general rule, a condition must be exactly fulfilled before liability arises on a contract.[208]

Under Nebraska law, a condition is excused if the occurrence of the condition is prevented by the party whose performance is dependent upon the condition.[209]   "That person must put forth a

---

[203] PLA-2009, Ex. 1 ¶ 14(b)(iii)(1), ECF No. 155-19.

[204] *Harmon Cable Commc'ns of Neb. Ltd. P'ship v. Scope Cable Television, Inc.*, 468 N.W.2d 350, 358–59 (Neb. 1991) (quoting Restatement (Second) of Contracts § 224 (1981)).

[205] *Omaha Public Power Dist. v. Employers' Fire Ins. Co.*, 327 F.2d 912, 915 (8th Cir. 1964) (citing *O'Brien v. Fricke*, 27 N.W.2d 403 (Neb. 1947)).

[206] *Harmon*, 468 N.W.2d at 359 (internal quotations omitted).

[207] *Id.*

[208] *Id.*

[209] *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 457 (Neb. 1987).

good faith effort to obtain the condition."[210]  And if a promisor prevents or hinders the occurrence of a condition precedent, the condition is excused.[211]  Further, "[w]here a party's repudiation contributes materially to the nonoccurrence of a condition of one of [its] duties, the nonoccurrence is excused."[212]

In its motion for summary judgment, Digital states it has outsourced the manufacture of its FirstVu camera, the product that Digital had anticipated would include $Z^3$ DM365 modules. Through this outsourcing, Digital argues it is not using $Z^3$'s design for DM365 modules.  Because it will purportedly never need and never purchase DM365 modules from any supplier, Digital argues there will be no competing prices, quality standards and delivery terms that $Z^3$ can meet or exceed. As a result, Digital concludes that the conditions to $Z^3$'s right of manufacture have not been fulfilled and will never be fulfilled.

Under PLA-2009, $Z^3$ had a contractual right to manufacture a minimum of 12,000 units per year for three years, or receive an equivalent royalty, provided its pricing, quality, and delivery schedule were competitive.  There is no requirement in Section 14(b)(iii)(1) that Digital actually sell products containing $Z^3$ DM365 modules to trigger its obligation to place minimum orders.  Even assuming Digital's interpretation of the condition precedent, it appears to have been Digital's decision to outsource the manufacture of the FirstVu product that prevented the purported condition

---

[210] *Id.*

[211] *Id.*

[212] *Id.* at 458.

from occurring.[213]   Accordingly, the Court denies Digital's motion for summary judgment on this issue.

Turning to $Z^3$'s motion, $Z^3$ argues that Digital's repudiation of PLA-2009 excused the condition that its pricing, quality, and delivery schedule be competitive. As discussed above, Digital repudiated PLA-2009 through its April 10, 2009 letter. The April 10, 2009 letter then caused $Z^3$ to stop working on the DM365 module.[214]   As a result, $Z^3$ was prevented from demonstrating that its pricing, quality, and delivery schedule were competitive. The Court concludes Digital's repudiation of PLA-2009 excused any condition precedent to Digital's obligation to place minimum orders.[215] Accordingly, the Court grants summary judgment to $Z^3$ on this issue.

> b.   $\underline{Z^3 \text{ is entitled to } \$270,000 \text{ rather than its lost profits on } 36,000}$
> $\underline{\text{modules.}}$

The Court addressed contract construction issues in its last Memorandum and Order denying Digital's first motion for partial summary judgment. Digital had argued that it was not obligated to pay a $270,000 royalty because the royalty clause in paragraph 14(b)(iv) of Exhibit 1 to PLA-2009 was conditioned on Digital's selling products containing $Z^3$ DM365 modules. In opposing the motion, $Z^3$ argued that the minimum royalty clause was unconditional. The Court agreed with $Z^3$ and denied Digital's motion.

In a footnote, the Court noted that under its reading of paragraph 14(b)(iii) of Exhibit 1 to PLA-2009, Digital was required to place a minimum guaranteed order of 12,000 modules per year,

---

[213] *Id*. at 457 (condition is excused if the occurrence of the condition is prevented by the party whose performance is dependent upon the condition).

[214] Caldwell Aff. ¶ 17, ECF No. 155-1.

[215] *See Chadd*, 412 N.W.2d at 458 (stating that where a party's repudiation contributes materially to the nonoccurrence of a condition of one of its duties, the nonoccurrence is excused).

for a three year period, at an estimated price of $100 per module or pay an equivalent royalty of $90,000 per year for a three year period. The Court noted that neither party had addressed whether paying a royalty of $270,000 would be a sufficient measure of damages. But the only issue actually resolved by the Court in its prior Order was that Digital's obligation to pay a royalty was not conditioned upon Digital selling products containing $Z^3$ designed DM365 modules.[216]

In its current motion, Digital argues that $Z^3$ is not entitled to seek its lost profits from Digital's failure to place minimum orders because Digital could have performed its obligations under PLA-2009 by paying a minimum royalty of $270,000.

In interpreting a contract under Nebraska law, courts must first determine, as a matter of law, whether the contract is ambiguous.[217] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[218] A determination as to whether ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.[219] If the contents of the document are not ambiguous, the document will be enforced according to its terms.[220]

---

[216] Order at 19, ECF No. 113.

[217] *Estate of Stine v. Chambanco, Inc.*, 560 N.W.2d 424, 428 (Neb. 1997).

[218] *Id*.

[219] *Id.*

[220] *Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha*, 540 N.W.2d 101, 105 (Neb. 1995).

48

If the Court determines that a contract is ambiguous, the meaning of the contract is a question of fact for the fact finder.[221]  Extrinsic evidence may be considered to determine the meaning of an ambiguous contract.[222]  A written instrument is open to explanation by parol evidence when its terms are susceptible to two constructions or where the language employed is vague or ambiguous.[223]

Paragraph 14 of Exhibit 1 to PLA-2009 is entitled "Guaranteed Minimum Purchase Quantity or Minimum Royalty."[224]  Sub-paragraph 14(b)(iii) states:

> iii)  Minimum 12,000 units or equivalent Royalty PER YEAR for 3 years.
>
> (1) LICENSEE will provide LICENSOR 1st opportunity to manufacture modules given LICENSOR's per module pricing, quality, and delivery are competitive with alternative manufacturers, including consideration of royalty cost for non-Z3 manufactured modules.[225]

Pursuant to this clause, Digital contends it could fulfill its obligations under PLA-2009 by either: (1) purchasing 12,000 units for three years; or (2) paying an equivalent royalty for three years.  In other words, Digital could allegedly discharge its obligation to purchase 36,000 modules by paying an equivalent royalty.  Digital argues Z3's damages should be limited to the smaller amount of recovery, or $270,000.

Z3 argues Digital is improperly treating the royalty provision as a liquidated damages clause.  In its opposition, Z3 points out that parties may stipulate in advance to a sum of money to be paid

---

[221] *Davenport Ltd. P'ship v. 75th & Dodge I, L.P.*, 780 N.W.2d 416, 423 (Neb. 2010).

[222] *Id.*

[223] *Id.*

[224] PLA-2009, Ex. 1 ¶ 14, ECF No. 155-19.

[225] *Id*. Ex. 1 ¶ 14(b)(iii).

in the event of a breach,[226] but that the royalty provision of PLA-2009 does not have any of the characteristics of a liquidated damages provision.  Digital's argument is not based upon on the royalty provision being a liquidated damages clause, however.  Digital argues that payment of the royalty was an alternative means of *performing* the contract.  In other words, Digital contends Paragraph 14(b)(iii) created an alternative contract.

The Court has not found any Nebraska law on point dealing with alternative contracts.  The Court believes Nebraska would follow the general law of contracts in the absence of any contrary authority.

Commentators have suggested there are three ways to view a contract expressed in the alternative: (1) a contract contemplating a single definite performance with a penalty stated as an alternative; (2) a contract contemplating a single definite performance with a sum named as liquidated damages as an alternative; or (3) a contract by which either alternative may prove the more advantageous and is as open to the promisor as the other.[227]   In a true alternative contract, "either one of two performances may be given by the promisor and received by the promisee as the agreed exchange for the return performance by the promisee."[228]   "This may be so even though one

---

[226] *Berens & Tate, P.C. v. Iron Mountain Info. Mgmt., Inc*., 747 N.W.2d 383, 387 (Neb. 2008).

[227] *Superfos Invs. Ltd. v. Firstmiss Fertilizer, Inc*., 821 F. Supp. 432, 434 (S.D. Miss. 1993) (quoting 5 S. Williston, *A Treatise on the Law of Contracts* § 781 at 706–07 (3d ed. 1961)).

[228] *In re Cmty. Med. Ctr.*, 623 F.2d 864, 867 (3d Cir. 1980); Restatement (First) of Contracts § 344 cmt. a. *See also* Restatement (Second) of Contracts § 356, cmt. c (recognizing that parties may contract for alternative performances).

of the alternative performances is the payment of a fixed sum of money" – "that fact alone does not make the contract one for single performance with a liquidated damage provision for a breach."[229]

The damages for breach of an alternative contract are determined in accordance with the alternative that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.[230]  The Restatement of Contracts provides the following illustration:

> For a sufficient consideration, A promises to convey Blackacre to B or to pay B $1000 at A's election. This is a contract to perform one of two alternatives at the option of A; and the $1000 is neither a penalty nor liquidated damages. In case of breach by A by performing neither alternative, B's damages are measured by the less valuable of the two alternatives.[231]

Neither party argues that Paragraph 14(b)(iii) is ambiguous, and the Court agrees.  Paragraph 14(b)(iii) requires $Z^3$ to order a minimum of 12,000 units per year for three years or pay equivalent royalty per year for three years.  Under the plain reading of this clause, Digital could perform its obligations under PLA-2009 by purchasing 36,000 modules or paying the equivalent royalty.  In other words, Paragraph 14(b)(iii) specifies the payment of a minimum royalty as an alternative to placing minimum orders of 36,000 units.  $Z^3$ does not offer an alternative interpretation of Paragraph 14(b)(iii) or otherwise explain how Digital's view that this provision creates an alternative contract is incorrect.

-----

[229] *In re Cmty. Med. Ctr.*, 623 F.2d at 867.

[230] Restatement (First) of Contracts § 344.  *See also* 25 Richard A. Lord, Williston on Contracts, § 66:106 (4th ed.) ("A promise of one of several alternative performances will give the choice of alternatives, unless the contrary is stated to the person who is to render the performance . . . . the measure of damages for the breach of such a contract is generally considered to be the value of the alternative least onerous to the defendant.").

[231] Restatement (First) of Contracts § 344, illus. 1.

The Court construes Paragrpah 14(b)(iii) as creating an alternative contract wherein Digital could perform its obligations under PLA-2009 by purchasing 36,000 modules or paying an equivalent royalty over a three year period.  As a result, $Z^3$'s damages are limited to the alternative that results in the lesser recovery – a royalty payment for three years.

Although not dispositive, the Court's interpretation appears to be consistent with how $Z^3$ pled its counterclaim for breach of PLA-2009.[232]  Paragraph 14 of $Z^3$'s counterclaim states:

> PLA-2009 also provides, in part, that Digital guaranteed that it would submit certain minimum orders or pay an equivalent royalty as set forth below:
>
> • At least 50 units of module Z3-DM365-MOD-0X-SP2 (the "DM365 Module") at $200 per unit, for a total minimum order price of $10,000;
>
> • An initial production order of at least 3,000 units of the DM365 Module at $100 per unit, for a total minimum initial production order price of $300,000; and
>
> • *At least 12,000 units of the DM365 Module per year, for three years, at a target price of $100 per unit, or pay an equivalent royalty of $90,000 per year.*[233]

Royalties are also discussed in Paragraph 14(b)(iv) of Exhibit 1 to PLA-2009.  Paragraph 14(b)(iv) states:

> If LICENSOR cannot provide on-time delivery, a price and quality acceptable to LICENSEE, or is not willing to produce Z3-DM365-MOD-OX-SP2, then LICENSEE has the right to use alternative manufacturing.  LICENSEE is liable for royalty of $7.50 per unit on modules actually sold by LICENSEE on all modules not manufactured by Z3.  If LICENEE [sic] does not order 36,000 units at 12,000 units per year, LICENSEE is [to] pay a minimum royalty to LICENSOR equivalent to 12,000*7.500 = $90,000 royalty per

---

[232] Am. Countercl. ¶ 14, ECF No. 62.

[233] *Id*. (emphasis added).

calendar year or the pro-rated balance if at least some units have been purchased within the fiscal year in question.

In analyzing this provision, both parties agree that Digital's obligation to pay royalties attaches whenever Digital, for any reason, does not order 36,000 modules from $Z^3$.[234]   In other words, Digital's obligation to pay royalties was not triggered only if $Z^3$ failed to provide on-time delivery, a price or quality acceptable to Digital, or was unwilling to produce the modules.  As a result, this provision appears to be consistent with Paragraph 14(b)(iii) and does not alter the Court's analysis or interpretation of Paragraph 14(b)(iii).

In its opposition to Digital's motion, $Z^3$ also contends that it is entitled to its lost profits "on top of $270,000."   In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole.[235]  Here, if Digital had ordered 36,000 modules, then it would not have been obligated to pay any royalties.  The Court disagrees that $Z^3$ would be entitled to $270,000 *plus* its lost profits on the 36,000 units.

There is no dispute that Digital did not order 36,000 units or pay an equivalent royalty over a three year period.  Paragraph 14(b)(iv) calculates the royalty to be $90,000 per year.  Accordingly, the Court finds $Z^3$ is entitled to $270,000 as a result of Digital's failure to meet the requirements of Section 14(b)(iii).

2. <u>$Z^3$'s damages from Digital's failure to place unconditional minimum orders are an issue for the trier of fact.</u>

---

[234] This is consistent with the interpretation argued by $Z^3$ in its response to Digital's first motion for summary judgment.

[235] *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 639 (Neb. 2008).

As discussed above, PLA-2009 also has two unconditional minimum order terms: (1) 50 pre-production sample units at $200 per unit; and (2) 3,000 units during the first fiscal year of the contract at $100 per unit.[236]  In its motion, Z[3] seeks an order that it is entitled to its lost profits in the amount of $212,552.50 from Digital's failure to order the 3,050 units.[237]  Z[3] also seeks $1,209,458 in payroll expenses for the period 2009-2012.

"One injured by a breach of contract is entitled to recover all its damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach."[238]  Damages do not need be proved with mathematical certainty, but nor can they be established by evidence which is speculative and conjectural.[239] "There is no precise formula for determining lost profits, and the only requirement in Nebraska is that the calculation be supported by some financial data which would permit an estimate of the actual loss to be made with reasonable certitude and exactness."[240]

The proper method of calculating damages for lost profits is based upon lost net profits, not gross profits.[241]  "[W]here a plaintiff presents evidence of only gross profits and fails to provide

---

[236] PLA-2009, Ex. 1 ¶¶ 14(a) & (b)(ii), ECF No. 155-19.

[237] Z[3] contends its cost to manufacture the DM365 module would have been $31.95. Caldwell Aff. ¶ 20, ECF No. 155-1.  3,050 x $31.95 = $97,447.50.  $310,000 - $97,447.50 = $212,552.50.

[238] *Aon Consulting, Inc.*, 748 N.W.2d at 639.

[239] *Id.*

[240] *Id.* at 643.

[241] *Home Pride Foods, Inc. v. Johnson*, 634 N.W.2d 774, 783 (Neb. 2001).

evidence of expenses and overhead costs from which net profits can be calculated, the plaintiff has failed to present sufficient evidence of lost profits."[242]

To establish its lost profits, Z[3] attaches the report of its expert, Craig Chance. Digital does not offer any evidence directly challenging or contradicting the figures relied upon by Mr. Chance. Rather, Digital appears to argue that Z[3] has not provided evidence of its lost *net* profits.

In its opposition to Digital's prior motion for summary judgment, Z[3] proposed calculating its net profits using the contract price of the modules, less the cost of manufacture, less allocable overhead, multiplied by the number of modules to be sold under the contract.[243] At that time, Z[3] had not yet determined what portion of its overhead expenses was properly allocable to its lost profit analysis. In the instant motion, Z[3] presents evidence of the cost to manufacture the modules, but it has not presented evidence of any other overhead costs. In its expert report, Mr. Chance writes, "The *main* portion of Z3's variable overhead is incurred during the design process . . ."[244] This suggests that Z[3] would have incurred some variable overhead costs after the design period was over, but Mr. Chance does not deduct any amount for such costs or further explain this statement. Additionally, Z[3] has not explained why it is entitled to recover payroll expenses for 2009–2012.

The Court concludes Z[3] has not established, as a matter of law, its lost profits caused by Digital's failure to order the 3,050 modules specified in Paragraph 14(a) & (b)(ii) or its right to recover additional payroll expenses. Therefore, the amount of Z[3] damages caused by Digital's

---

[242] *Id*.

[243] This is similar to the method used in *Holiday Mfg. Co. v. B.A.S.F. Sys., Inc.*, 380 F. Supp. 1096, 1105 (D. Neb. 1974).

[244] Preliminary Report of Lost Profits at 2, ECF No. 155-6.

failure to order 3,050 modules is an issue for the finder of fact at trial.  Accordingly, the Court denies Z[3]'s motion for summary judgment on this issue.

        3.      <u>Z[3] is entitled to $175,000 in unpaid fees.</u>

Paragraph 13 of Exhibit 1 to PLA-2009 requires Digital to pay Z[3] $300,000 in fees.[245] Digital made two fee payments on PLA-2009 – one in the amount of $75,000 on January 2, 2009 and one in the amount of $50,000 on February 6, 2009.[246]  Digital never paid the remaining $175,000 due under PLA-2009.[247]  Digital raises no specific challenge to Z[3]'s claim for the unpaid $175,000. The Court finds that Z[3] is entitled to $175,000 in unpaid fees.

      E.      <u>Z[3] Has Not Established It is Entitled to Damages from Digital's Purported Breach of PLA-2008.</u>

PLA-2008 required Digital to pay Z[3] $155,000 in fees and per-unit prices for 1,000 DM355 modules.[248]  Pursuant to these terms, Digital paid Z[3] $140,000 of the $155,000 fee.[249]  In Count II of its counterclaim, Z[3] contends Digital breached PLA-2008 because it has not paid the remaining $15,000 in fees due under the contract.

In Count I of its Complaint, Digital contends that Z[3] breached PLA-2008 by delivering 1,000 non-conforming modules.[250]  Digital identifies six reasons why the modules were non-conforming.[251]

---

[245] PLA-2009, Ex. 1 ¶ 13, ECF No. 155-19.

[246] Pretrial Order ¶ 4.a.6 (stipulation no. 6), ECF No. 148.

[247] Caldwell Aff. ¶ 19, ECF No. 155-1.

[248] PLA-2008, ECF No. 155-16.

[249] Pretrial Order ¶ 4.a.14, (stipulation no. 14), ECF No. 148.

[250] Compl. ¶ 15, ECF No. 1; Pretrial Order ¶ 5.a.i, ECF No. 148.

[251] Compl. ¶ 15, ECF No. 1.

Digital denies that it owes Z[3] any further fees under PLA-2008. Rather, Digital contends it has incurred damages in the amount of $23,994,495.00 from Z[3]'s purported breach.[252]

Z[3] moves for summary judgment on Count II of its counterclaim for $15,000 damages caused by Digital's breach of PLA-2008 and against Digital on Digital's claim for breach of PLA-2008.

Even if the modules were non-conforming,[253] Z[3] contends Digital is not entitled to any monetary damages because Digital did not comply with the warranty provisions of the contract. Under the "Warranties and Limitations" section of PLA-2008, the parties agreed to separate warranty provisions with regard to software and hardware. In relevant part, the contract provides with regard to software that:

> LICENSOR WARRANTS FOR THIRTY (30) DAYS AFTER PURCHASE THAT THE MEDIA (IF THE SOFTWARE IS PROVIDED ON MEDIA) WILL BE FREE FROM DEFECTS AND THAT THE SOFTWARE PROGRAMS WILL SUBSTANTIALLY CONFORM TO THE PRODUCT REQUIREMENTS SET FORTH IN THE ATTACHED LICENSE EXHIBIT 1.
>
> THE LICENSED MATERIALS ARE OTHERWISE PROVIDED "AS IS". LICENSOR MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OR COMPLETENESS.[254]

In other words, Z[3] provided a 30-day warranty that the software would substantially conform to the contractual product requirements. Z[3] delivered the DM355 software on December 24, 2008.[255]

---

[252] Pretrial Order ¶ 10.b., ECF No. 148.

[253] Z[3] denies that the modules were non-conforming.

[254] PLA-2008, ECF No. 155-16.

[255] E-mail from Aaron Caldwell to Jeff Burgess (Dec. 24, 2008), ECF No. 155-17.

Z[3] delivered the DM355 modules in two lots, 200 units on January 14, 2009 and 800 units on March 10, 2009.[256]  Z[3] argues that Digital did not provide notice of any breach of warranty within the agreed 30-day period, and thus has no claim regarding any software issues in the DM355 module.

In its response, Digital focuses on the alleged defects in the DM355 module, but does not address the substance of Z[3]'s argument regarding the warranty provisions.  From Digital's Separate Statement of Material Facts, it appears that Digital contends that the issues with the DM355 modules were hardware related, not software related.  But because this is not entirely clear, the Court will address the merits of Z[3]'s argument.

Aaron Caldwell states that until being served with the complaint in this lawsuit,[257] Digital never informed Z[3] that the delivered software was defective or unacceptable.  The only testimony cited by Digital that potentially relates to this issue is that of Doug Fletcher, who stated that he spoke with Aaron Caldwell about issues with "pink noise" probably in the April 2009 time frame, but was not sure when the conversation actually occurred.[258]  This is more than thirty days after the 200 units delivered on January 14, 2009.  And the testimony is too vague and uncertain to establish that it was within thirty days of the March 10, 2009 delivery.  It is also not clear from Fletcher's testimony that his comments were sufficient to put Z[3] on notice that Digital was claiming a breach of warranty.[259]  In short, Digital has not provided any contrary evidence that it provided timely notice to Z[3] that it

---

[256] Caldwell Aff. ¶ 10, ECF No. 155-1.

[257] Service appears to have occurred sometime in June 2009. Caldwell Aff. ¶ 10, ECF No. 155-1.

[258] Fletcher Dep. 13:10–17:20, ECF No. 172-19.

[259] See Cox v. Greenlease-Lied Motors, 277 N.W. 819, 822 (Neb. 1938) (discussing requirements of notice on a breach of warranty claim).

breached the software warranty.  As a result, the Court concludes Digital has no claim regarding software issues in the DM355 module.[260]

This does not resolve the issue, however, because Digital apparently contends there were various hardware issues with the DM355 module.[261]  In relevant part, PLA-2008 provides with regard to hardware that:

> LICENSOR WARRANTS FOR ONE HUNDRED EIGHTY (180) DAYS AFTER RECEIPT BY LICENSEE OF THE LICENSED MATERIALS HARDWARE THAT THE LICENSED MATERIALS HARDWARE SHALL BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP, AND WILL PERFORM SUBSTANTIALLY IN ACCORDANCE WITH THE SPECIFICATIONS AND RELATED DOCUMENTATION PROVIDED TO LICENSEE.
> . . . .
>
> THE LICENSOR WILL PROVIDE LICENSEE UP TO 3% REPLACEMENT FOR PRODUCT RETURNED DURING WARRANTY DUE TO HARDWARE DEFECT IN LICENSED MATERIALS OR DUE TO MANUFACTURING PROCESS PROVIDED BY LICENSOR. LICENSOR WILL HAVE THE RIGHT TO REQUEST RETURNED WARRANTY PRODUCT FOR INSPECTION. LICENSOR WILL BE RESPONSIBLE FOR SHIPPING COSTS ASSOCIATED WITH RETURNS.
>
> IN THE ADVENT OF CATASTROPHIC FAILURE, DEFINED AS A FAILURE RATE OF GREATER THAN 10% DUE TO HARDWARE DEFECT(S) IN LICENSED MATERIALS OR DUE TO LICENSOR'S MANUFACTURING PROCESS, LICENSOR SHALL ASSIST IN DETERMINATION OF THE ROOT CAUSE OF THE FAILURE AND SHALL REPAIR OR REPLACE THE DEFECTIVE MATERIALS AT LICENSOR'S OPTION AND EXPENSE.  ANY SUCH REPAIR OR REPLACEMENT SHALL

---

[260] *See Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 10–11 (1st Cir. 2006) (upholding summary judgment on a breach of warranty claim because party failed to provide notice of a breach of warranty within the time period allotted in the contract).

[261] *See* Pretrial Order, ECF No. 148.  In its motion for summary judgment, Z[3] does not argue Digital failed to provide timely notice of the alleged hardware defects.

> BE COMPLETED IN A TIMELY FASHION AS IS PRACTICAL
> . . .   LICENSOR WILL HAVE THE RIGHT TO REQUEST
> RETURNED WARRANTY PRODUCT FOR INSPECTION.
> LICENSOR WILL BE RESPONSIBLE FOR SHIPPING COSTS
> ASSOCIATED WITH RETURNS.
>
> THE LICENSED MATERIALS ARE OTHERWISE PROVIDED
> "AS IS". LICENSOR MAKES NO WARRANTIES OR
> REPRESENTATIONS, EXPRESS, IMPLIED OR STATUTORY,
> INCLUDING ANY IMPLIED WARRANTIES OF
> MERCHANTABILITY, FITNESS FOR A PARTICULAR
> PURPOSE, ACCURACY OR COMPLETENESS.

For catastrophic failure of hardware – defined as greater than a 10% failure rate due to hardware defects or $Z^3$'s manufacturing process, $Z^3$ had the option of either repairing or replacing the modules at its own expense.  Because Digital claims that all 1,000 modules have the same defects, this "catastrophic failure" clause is triggered.  $Z^3$ contends Digital cannot recover for breach of contract because it never asked $Z^3$ to repair or replace the defect and refuses to accept $Z^3$'s offer to replace or repair the alleged defects.

It is not clear to the Court whether it was Digital or $Z^3$ that failed to perform their respective obligations under the repair or replace clause.  Although $Z^3$ faults Digital for not returning the modules for repair or replacement, there is no evidence that $Z^3$ ever requested that the modules be returned for its inspection.   Under the terms of PLA-2008, it is not clear which party was obligated to initiate the repair or replacement of the modules.

$Z^3$ also contends that Digital refused $Z^3$'s offer to repair or replace the modules.  In support of this, $Z^3$ cites the deposition testimony of Heckman and Ross:

> Q.   (By Mr. Wilson)   Let me ask you a non-hypothetical, completely plausible question.
> Will you accept Z3's offer to repair or replace the 355 modules?
> A.   Today?
> Q.   Yeah.

> A.   I'm not in a position to make that decision.  I have to be an
>       engineer to know that it would be used in today.[262]
> Q.   (By Mr. Wilson) Will Digital accept Z3's offer to repair or
>       repair the 355 modules?
>       Mr. Daniels: Objection, calls for legal conclusion.  But you
>       can answer.
> A.   I don't know.  I would have to talk to the team and see if
>       there's any value there.[263]

The depositions of Heckman and Ross occurred in April 2011 – nearly two years after this lawsuit was filed.  It is not clear if the questioning by Z3's counsel was intended to be the offer to repair or replace.  If so, it is difficult for the Court to see how such an offer was timely.  Z$^3$ has not presented evidence of a prior offer to repair or replace.  In short, the Court has insufficient information to rule in favor of Z$^3$ at this time.

Even if the Court does not grant summary judgment to Z$^3$ on the entirety of Digital's claims, Z$^3$ argues that the Court should grant summary judgment to Z$^3$ on Digital's claims for indirect and consequential damages.

The Warranties and Liabilities section of PLA-2008 provides:

> IN NO EVENT SHALL LICENSOR, OR ANY APPLICABLE LICENSOR, BE LIABLE FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES, HOWEVER CAUSED, ON ANY THEORY OF LIABILITY AND WHETHER OR NOT LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING IN ANY WAY OUT OF THIS AGREEMENT, THE LICENSED MATERIALS OR LICENSEE'S USE OF THOSE MATERIALS. EXCLUDED DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, COST OF REMOVAL OR REINSTALLATION, COMPUTER TIME, LABOR COSTS, LOSS OF GOODWILL, LOSS OF PROFITS, LOSS OF SAVINGS, OR LOSS OF USE OR INTERRUPTION OF BUSINESS.

---

[262] Heckman Dep. 128:23–129:6, ECF No. 155-34.

[263] Ross Dep. 69:14–23, ECF No. 155-35.

> IN NO EVENT WILL LICENSOR'S AGGREGATE LIABILITY
> UNDER THIS AGREEMENT OR ARISING OUT OF LICENSEE'S
> USE OF THE LICENSED MATERIALS EXCEED THE FEES
> PAID TO LICENSOR BY LICENSEE FOR THE LICENSED
> MATERIALS OR FIVE HUNDRED DOLLARS (U.S.$500),
> WHICHEVER IS GREATER.[264]

Z[3] argues that under the clear and unambiguous language of PLA-2008, Digital has no claim for any damages beyond the $140,000 it paid on the contract.  As discussed previously, contracts written in clear and unambiguous language must be enforced according to their terms.[265]  And "parties to a contract may override the application of the judicial remedy for breach of a contract by stipulating, in advance, to the sum to be paid in the event of a breach."[266]  Nebraska courts have "consistently upheld the right of contracting parties to privately bargain for the amount of damages to be paid in the event of a breach of contract, provided the stipulated sum is reasonable in light of the circumstances."[267]  When the parties are "experienced in business, the damages are economic, and the parties had fair opportunity to consider the agreement, courts rarely find that liability limitations are unconscionable."[268]

Here, the parties unambiguously agreed that Digital's damages would be limited to the amount it paid under the contract.  In its response, Digital does not address Z[3]'s argument or otherwise explain why the limitation of damages is not enforceable.  There is nothing before the

---

[264] PLA-2008 at 3, ECF No. 155-16.

[265] *Lexington Ins. Co. v. Entrex Commc'ns Servs., Inc.*, 749 N.W.2d 124, 132 (Neb. 2008).

[266] *Reichert v. Hammond, L.L.C.*, 645 N.W.2d 519, 527 (Neb. 2002) (internal quotations omitted).

[267] *Id.*

[268] *Id.*

Court demonstrating that the agreed-upon damages are so small as to be unconscionable. Accordingly, the Court concludes that Digital's damages, if any, from $Z^3$'s purported breach of PLA-2008 are limited to $140,000.

## V.     Summary

The Court holds that Haler had apparent authority to execute PLA-2009 on behalf of Digital. As a result, PLA-2009 is a valid and enforceable agreement between Digital and $Z^3$. The Court grants summary judgment to $Z^3$ on Counts II and III of Digital's Complaint.

The Court concludes that $Z^3$ substantially performed its obligations under PLA-2009 and that Digital breached PLA-2009. PLA-2009 required Digital to place a conditional minimum order of 36,000 units and an unconditional order of 3,050 units. $Z^3$ is entitled to $270,000 for Digital's failure to order the 36,000 modules. The lost profits caused by Digital's failure to order the 3,050 modules are an issue for the finder of fact at trial. $Z^3$ is entitled to $175,000 in unpaid fees under PLA-2009.

At this point, the Court is unable to determine which party breached PLA-2008. Regardless, Digital's damages, if any, from $Z^3$'s purported breach are limited to $140,000. If the trier of fact concludes Digital breached PLA-2008, $Z^3$ seeks $15,000 in damages.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Second Motion for Partial Summary Judgment (ECF No. 160) is hereby granted in part and denied in part.

**IT IS FURTHER ORDERED** that Defendant and Counterplaintff $Z^3$'s Motion for Summary Judgment (ECF No. 152) is hereby granted in part and denied in part.

**IT IS SO ORDERED.**

Dates this 29th day of March, 2012 at Topeka, Kansas.

<u>s/K. Gary Sebelius</u>
K. Gary Sebelius
U.S. Magistrate Judge